**D.S.I., Stewart J. "Jason" Mart and Aquatic Renovation Systems, Inc., Appellants,**

v.

**NATARE CORPORATION, Appellee.**

**No. 49A02–0001–CV–50.**

Court of Appeals of Indiana.

Dec. 29, 2000.

Rehearing Denied Feb. 13, 2001.

Michael L. Einterz, Indianapolis, Indiana, Attorney for Appellants.

David E. Wright, Jeffrey L. Carmichael, Leagre Chandler & Millard, LLP, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge

Stewart J. Mart, Duraplastic Systems, Inc. (D.S.I.), and Aquatic Renovation Systems, Inc. (A.R.S.) (hereinafter collectively referred to as "D.S.I." unless otherwise indicated) appeal from an award of attorney fees in favor of Natare Corporation. The appellants present the following consolidated, restated issues for review:

1. Was Natare a "prevailing party" within the meaning of Ind.Code Ann. § 34–52–1–1 (West 1999), such that Natare was eligible for an award of attorney fees under that statute?

2. Did the trial court err in determining that D.S.I.'s action was frivolous, baseless, unreasonable, or brought in bad faith?

3. Did the trial court err in piercing the corporate veil and making Mart personally liable for paying the assessment of attorney fees?

4. Did the trial court err in awarding Natare $75,000 in attorney fees?

5. Is Natare entitled to appellate attorney fees?

We affirm.

The underlying facts revolve around a series of disputes that began more than ten years ago between Mart and Michael Walsh, the owner of Natare. A review of the history of the course of litigation is useful in understanding the controversy at hand.

During the 1980s, Walsh and J. Kenneth McNeeley were each 50% owners of Recreonics Corporation, which was engaged in the business of selling swimming pools and aquatics-related equipment. There were two major facets of the corporation— a mail-order catalogue sales division and a commercial-construction and swimming-pool-liner division. Mart was an employee of Recreonics sometime in the 1980s, but his association with that corporation had been severed by 1989. In 1989, Recreonics filed a lawsuit against Mart alleging that he had made false and disparaging statements about Recreonics, its products, and its business practices. As a result of this action, Recreonics sought and received a preliminary injunction against Mart in October 1991. Generally, Mart was enjoined from undertaking tortious and defamatory conduct against Recreonics.

In April 1991, Recreonics informed its creditors that it was unable to pay approximately $1,400,000 of its obligations, and it proposed to pay its creditors pro rata from existing cash flow. Also about this time, Walsh and McNeeley began to experience serious disputes between themselves about the manner in which the company should be directed. As a result, McNeeley and Walsh entered into an Agreement and Plan of Reorganization, whereby Recreonics was effectively split into two entities. McNeeley retained the mail-order and catalog-sales divisions, as well as the name "Recreonics Corporation." Walsh received the commercial and liner divisions, which would operate as a new entity named "Natare Corporation."

On April 22, 1992, shortly after the reorganization was implemented, McNeeley and Recreonics filed suit against Walsh and Natare, alleging that Walsh and Natare had improperly used the name "Recreonics" in Natare's business, in contravention of the terms of the reorganization agreement. As a result of this lawsuit, Natare was enjoined from using the Recreonics name in Natare's business.

By April 1993, McNeeley and Recreonics had filed for bankruptcy under Chapter 7 of the United States Bankruptcy Code. Merrill Moores was appointed to act as Trustee over Recreonics's bankruptcy estate. Moores decided not to pursue the action against Walsh and Natare because of the anticipated expense involved. On November 29, 1994, the bankruptcy court approved Moores's recommendation that Recreonics Corporation be sold to Frank Jones, Jr. and the newly formed corporation, Recreonics, Inc. In addition to the other resources of Recreonics Corporation,

Recreonics Inc. also purchased its rights in the lawsuit against Walsh and Natare.

Meanwhile, Mart had formed D.S.I. and A.R.S., corporations engaged in the same general business as Recreonics Inc. and Natare. In October 1996, D.S.I. sent a letter to numerous creditors of Recreonics Corporation requesting assignment to D.S.I. of the claims any of those creditors might have against Recreonics Corporation. Roughly twenty-three creditors assigned their claims to D.S.I. Armed with these assignments of rights, on December 10, 1996, D.S.I. filed a complaint for damages against Natare alleging that Natare "removed and transferred assets of Recreonics Corporation that rendered Recreonics insolvent or greatly reduced its ability to continue and maintain its business or to pay its creditors." *Record* at 1–2. A Return of Summons Served was tendered to the Marion Superior Court, Room 6, indicating that the complaint had been served on December 12 by a Deputy "Ron Elliot." *Record* at 5. Natare did not file its answer within the requisite twenty-three days and, on January 7, 1997, D.S.I. filed a motion for default judgment, which was granted on January 9, 1997. D.S.I. immediately commenced garnishment proceedings against Natare, which culminated in the freezing of Natare's bank accounts.

On January 22, 1997, Natare was informed by its bank that its accounts had been frozen. It is undisputed that this information was in fact the means whereby Natare first became aware of the lawsuit filed by D.S.I. and the January 9 default judgment. On January 23, Natare appeared in court and filed a motion asking the court to set aside the default judgment on the ground that it had never been served with the summons. It was subsequently learned that the return of service reflecting that the complaint was served upon Natare had been forged.[1] The court granted the motion on the same day and dissolved the garnishment order. In a pleading dated January 23, 1997, D.S.I.'s attorney petitioned the court to reconsider its ruling granting the motion to set aside the default judgment.

In a release dated January 23, 1997, and distributed on that day and the following day by mail, fax, and hand delivery, D.S.I. sent a series of "press releases" to several businesses and trade publications in the swimming pool industry. The release notified the recipients of the January 9 default judgment D.S.I. had obtained against Natare. The document stated as follows:

> DSI Corporation of Indianapolis, Indiana was recently awarded a judgment of $337,818.00 against Natare Corp., also in Indianapolis, in the Marion County Superior Court # 6. The judgment was for funds due the creditors of the now bankrupt Recreonics Corp., which DSI had alleged were owed by Natare as a result of Natare's holding itself out as the continuing legal entity once known as Recreonics Corp., and for treble damages for civil fraud committed by Natare against the creditors of Recreonics Corp.

> Stewart J. Mart, the President of DSI commented, "We are very pleased with the judgment and want all the creditors of the old Recreonics Corp. to know that their concerns about the pre-bankruptcy assets transfered [sic] to Natare and partially resulting in Recreonics Corp.'s eventual bankruptcy were indeed well founded. The owner of Natare has lived by the sword of litigation for so many years that this result is particularly fitting."

> DSI has garnished Natare's checking accounts and will be garnishing the receivables of Natare Corp [sic] up to the judgment amount.

> For further information contact DSI at:

---

1. Deputy Ron Elliott submitted an affidavit stating that he did not serve the complaint upon Natare. Moreover, he noted that whoever signed the return had misspelled his name.

Natare Litigation Manager
DSI
P.O. Box 55074
Indianapolis, IN 46205

*Record* at 61. On January 25, D.S.I. sent the following letter to Natare's customers and other entities in the swimming pool business:

By now you are undoubtedly aware of the judgment entered in Marion County Superior Court # 6 against Natare Corp. in the amount of over $337,000. If this judgment and it's [sic] possible ramifications upon your current and potential business gives you pause as you contemplate your professional dealings with Natare Corp. in 1997 and beyond, know that there is a competitive and responsible supplier that stands ready to meet your PVC material needs.

All of us at RenoSys want to make certain that you are aware of our keen desire to expand and further develop our installing contractor relationships. As most of you are aware, RenoSys Corp [sic] offers a full range of PVC oriented product systems for the pool industry including the RenoSys PVC Pool Shell, RecDeck and CushionDeck Flooring and Decking products, Dura-Grate PVC Grating products and Dura-Tech PVC and stainless gutter systems....

*Record* at Exhibit 3, page 93.[2] The remainder of the letter is comprised of further descriptions of the products and services offered by D.S.I. Both the press release and the January 25 letters were prepared by Mart.

Mart claimed that he did not learn that the default judgment had been set aside until January 29. On February 4, D.S.I. sent out another press release. The following excerpt reflects the general tone of D.S.I.'s February 4 press release:

On January 23, 1997, we wrote you to advise you that DSI had recently ob-

tained a $337,818.00 judgment against Natare Corporation. That fact was true when we reported it to you, and it remains true. In the meantime, though, Natare has been able to forestall DSI's collection on its claims against Natare by convincing the court that it did not receive a copy of the lawsuit, and that the judgment should be set aside pending a trial of the case.

\*　　\*　　\*　　\*　　\*　　\*

If it gives him pleasure, Walsh is free to vehemently vent his indignation from the highest diving platform in the land. His venting will not change either the nature or substance of his past conduct or the fact that the bright lights of a courtroom will determine the final outcome in this matter and *not* Mr. Walsh's distortions, volume or opinion. DSI, on behalf of the more than 23 creditors of Recreonics Corp [sic], intends to fully pursue this matter to it's [sic] final inevitable conclusion.

When all is said and done, and after DSI's case goes to trial or Natare files bankruptcy, we'll likely be reporting to you again that DSI, for the benefit of Recreonics's creditors, has obtained a judgment against Natare.

*Record* at 1110–11 (emphasis in original).

On January 31, 1997, Natare filed a motion to dismiss pursuant to Indiana Trial Rule 12(B)(6). On February 14, 1997, Natare filed a motion to dismiss for lack of subject matter jurisdiction. On February 19, 1997, D.S.I. filed an amended complaint. On February 24, 1997, Natare filed a counterclaim and third-party complaint, naming Mart and A.R.S. as defendants. On February 26, 1997, Natare filed an application with the trial court seeking a preliminary injunction. The court granted the petition and issued an order enjoining D.S.I., A.R.S., and Mart from communicating with any other persons or entities on

---

**2.** Exhibit 3 of the Record of Proceedings consists of two separately bound volumes that contain 325 pages that are numbered 1

through 325. The page numbering in Exhibit 3 is separate from the sequential numbering in the other six volumes of the record.

the subjects of (1) Walsh and Natare, (2) Walsh and Natare's business and business practices, and (3) any litigation, including Recreonics's bankruptcy action, involving Walsh and Natare. On March 6, 1997, the court dismissed D.S.I.'s complaint for lack of subject matter jurisdiction, ruling that the bankruptcy court had exclusive jurisdiction over the action.

On March 6, 1997, D.S.I. filed a motion for change of judge. On March 20, 1997, D.S.I. filed a second amended complaint that was substantially similar to the previous complaint.[3] On March 31, 1997, Judge Johnson assumed jurisdiction over the case, replacing Judge Cutter. On July 9, 1997, Judge Johnson vacated all entries made by Judge Cutter between March 6 and July 9, including the entry of a preliminary injunction against D.S.I., A.R.S., and Mart.

On March 24, 1998, the parties entered into a settlement agreement. Two days later, the parties filed a joint request for an order approving the settlement agreement, as well as a stipulation of partial dismissal. According to the stipulation of partial dismissal, the parties stipulated to

> the partial dismissal, with prejudice, of all claims and counterclaims they have against each other in the above-entitled cause of action, for the reason that this matter has been partially settled between the parties to this action; **except that** the claims of Natare Corporation pursuant to Ind.Code 34–1–32–1, shall not be dismissed.

*Record* at 592 (emphasis in original). The court approved the settlement agreement and entered an order of partial dismissal. The effect of the order was to dismiss all claims between the parties except for Walsh and Natare's claim for attorney fees under Ind.Code Ann. § 34–1–32–1, the

predecessor to Indiana's current attorney fees statute, which is Ind.Code Ann. § 34–52–1–1 (West 1999). On March 2, 1998, the court entered a permanent injunction against Mart, D.S.I., and A.R.S., pursuant to the settlement agreement. The order enjoined Mart, D.S.I., and A.R.S. from:

A. disseminating information to former, existing or prospective customers of Natare Corporation designed to disparage Natare Corporation or its products;

B. making any statements which relate in any way to third parties the results of status of Cause No. 49D03–8901–CT–0073, Cause No. 49D06–9612–CP[–]1695 (now 49D02–9704–CP–0459) or the Chapter 7 proceeding, *In Re Recreonics Corporation,* U.S. Bankruptcy Court, Southern District of Indiana, Indianapolis Division, Cause No. 93–0158–RLB–7;

C. making any contact with or disseminating any information to suppliers of Natare Corporation for the purpose of impugning or disparaging Natare's reputation or goodwill;

D. making any statement to prospective customers, distributors, or competitors of Natare which purports to disparage or impugn the business practices of Michael T. Walsh.

*Record* at 1067–68.

On December 28, 1999, the court granted Natare and Walsh's request for attorney fees under IC § 34–52–1–1, upon the court's finding that the allegations in the appellants' complaint were frivolous, unreasonable, and groundless within the meaning of Indiana Code § 34–52–1–1. D.S.I., A.R.S., and Mart appeal the award of attorney fees.

---

**3.** The second amended complaint differed from the first complaint only with respect to two additional allegations set forth in the former. Those allegation were that (1) D.S.I.'s action was limited to claims for which the bankruptcy court did not then retain jurisdic-

tion, and (2) the Indiana court had jurisdiction over the matter under Articles 7 & 8 of the Indiana Constitution and Ind.Code Ann. § 32–2–7 because it alleged fraud and fraudulent transfer.

### 1.

D.S.I. contends that Natare Corporation is not eligible for attorney fees under IC § 34–52–1–1.

■ When reviewing an award of attorney fees under IC § 34–52–1–1, we apply a multi-step review. *Emergency Physicians of Indianapolis v. Pettit,* 718 N.E.2d 753 (Ind.1999) (reversing the decision of the court of appeals in this case with respect to a different issue, but affirming and incorporating by reference this aspect of the opinion of the court of appeals, *see Emergency Physicians of Indianapolis v. Pettit,* 714 N.E.2d 1111 (Ind.Ct.App.1999)). We first review the trial court's findings of fact under the clearly erroneous standard. Next, we review de novo the trial court's legal conclusions. Finally, we review the decision to award attorney fees and the amount thereof under an abuse of discretion standard. *Id.*

The trial court awarded attorney fees to Natare pursuant to IC § 34–52–1–1(b)(1), which provides: "In any civil action, the court may award attorney's fees as part of the cost to the prevailing party, if the court finds that either party: brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless[.]" This statute specifies that, as a threshold requirement, attorney fees may only be recovered by a "prevailing party."

The court's conclusion that Natare is a prevailing party and thus entitled to attorney fees is based upon Finding of Fact No. 21, which states: "While this cause was disposed by a Settlement Agreement, Natare obtained an enforceable injunction against DSI and others for future actions. Natare had sought that injunction from the first day counsel for Natare appeared in the case." *Record* at 918. We need not review this finding for clear error because D.S.I. does not dispute its accuracy. Therefore, we proceed to the second part of our analysis, which consists of a de novo review of the legal conclusion that a party who obtains an injunction under such circumstances is a "prevailing party" within the meaning of IC § 34–52–1–1(b).

■ We find no Indiana case that addresses the application of IC § 34–52–1–1 in this particular circumstance, nor do the parties bring one to our attention. We start, then, by examining the law our courts have generally applied when determining the meaning of "prevailing party" in the context of attorney fees. We note at the outset that because the attorney fees statute is in derogation of the American Rule observed under the common law, we strictly construe its language.[4] *O'Neill v. Goar,* 622 N.E.2d 562 (Ind.Ct.App.1993).

This court has repeatedly stated that "prevailing party" in the context of the attorney fees statute denotes a party who successfully prosecutes his claim or asserts his defense. *See Salcedo v. Toepp,* 696 N.E.2d 426, (Ind.Ct.App.1998). This provision has been interpreted several times, two of which we find instructive in the instant case. In the first of those cases, *Indiana State Bd. of Public Welfare v. Tioga Pines Living Center, Inc.,* 622 N.E.2d 935 (Ind.1993), *cert. denied,* 510 U.S. 1195, 114 S.Ct. 1302, 127 L.Ed.2d 654 (1994), approximately 785 Medicaid-certified, skilled nursing facilities and intermediate care facilities in Indiana filed an action against the Indiana State Board of Public Welfare. The class sought a declaration that Indiana's Medicaid reimbursement rules violated the federal Boren Amendment, 42 U.S.C. § 1396a(a)(13)(A), and its state counterpart, Ind.Code Ann. § 12–1–7–17.6(b), *repealed by* P.L.2–1992, § 897 (current version codified at Ind. Code Ann. § 12–15–14–2 (West Supp. 2000)). The plaintiffs were awarded judgment and attorney fees by the trial court. The defendants ultimately prevailed on the

---

4. Under the American Rule, parties in most instances pay their own attorney fees absent a statute, rule, or agreement to the contrary.

*Depeyster v. Town of Santa Claus,* 729 N.E.2d 183 (Ind.Ct.App.2000).

merits in a decision rendered by our supreme court.

On the question of attorney fees, the supreme court noted that the trial court had awarded attorney fees under 42 U.S.C. § 1988, which provides that a court may award reasonable attorney fees to the "prevailing party" in an action to enforce a provision of 42 U.S.C. § 1983. The court stated, "plaintiffs may be considered prevailing parties without obtaining a favorable final judgment following a full trial on the merits. Plaintiffs may prevail, for example, by consent decree or settlement which grants them the relief sought in bringing suit." *Indiana State Bd. of Pub. Welfare v. Tioga Pines Living Ctr., Inc.,* 622 N.E.2d at 946. It appears, then, that attorney fees would be available in a § 1988 action where the matter was resolved through a settlement agreement, so long as the requesting party "prevailed," or received what they sought in the underlying litigation.

The second case was a voting rights case that arose in the Federal District Court for the Southern District of Indiana. In *Dickinson v. Indiana State Election Board,* 817 F.Supp. 737 (S.D.Ind.1992), a group of voters filed a lawsuit in which they alleged that the alignment of Indiana House Districts 49 and 51 violated Section 2 of the Voting Rights Act, 42 U.S.C. § 1973. The Seventh Circuit Court of Appeals rendered a decision in which it determined that the district court must decide if there had been a violation of section 2, and remanded it to the lower court for that purpose. Before the district court made that decision, however, the Indiana General Assembly passed a redistricting plan that cured the defects of which the plaintiffs' lawsuit had complained. Thereafter, the parties entered into a stipulation stating that (1) the plaintiffs' suit was a "significant catalytic factor" in the decision to reapportion voting districts, *Dickinson v. Indiana State Election Bd.,* 817 F.Supp. at 746, and (2) plaintiffs could seek attorney fees under § 1988 in the event that the parties could not agree on same.

The district court noted that the threshold issue in deciding whether to award attorney fees under § 1988 was whether the plaintiffs were a "prevailing party." The court framed the standard as follows: "A prevailing party is one who succeeded 'on any significant issue in the litigation which achieve[d] some of the benefit the part[y] sought in bringing suit,' . . . and achieved some change in the parties' relationship as a result of the suit." *Dickinson v. Indiana State Election Bd.,* 817 F.Supp. at 745 (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). Applying the above standard, the court concluded that the plaintiffs "easily" qualified as prevailing parties. *Id.* at 746. The court explained its conclusion in terms relevant to the instant case:

> The stipulation resolved the dispute, altered the plaintiffs' legal relationship with the defendants, and demonstrated that the action had been a "significant catalytic factor" (and a causative link) in the General Assembly's decision to reapportion. It does not matter that the stipulation resulted from settlement, contained no outright admission of wrongdoing, or gave the plaintiffs less than all they requested.

*Id.* (citations and accompanying parenthetical information omitted).

We are aware that both *Tioga Pines Living Center, Inc.* and *Dickinson* addressed the meaning of "prevailing party" in the context of § 1988, not IC § 34–52–1–1. Nevertheless, the two provisions focus upon the same subject matter, albeit in different contexts—the former authorizes attorney fees in actions brought under 42 U.S.C. § 1983, while the latter is Indiana's general attorney fees statute. We perceive no meaningful distinction between the two contextual frameworks for purposes of determining the meaning of the term common to both, i.e., "prevailing party". In short, we conclude that "prevailing

party" means the same in either setting, and therefore *Tioga Pines Living Center, Inc.* and *Dickinson* are useful in determining the meaning of "prevailing party" as that term is used in IC § 34–52–1–1. Moreover, as we will explain, the term's meaning as set out in *Tioga Pines Living Center, Inc.* and *Dickinson* is consistent with its meaning in IC § 34–52–1–1, as it has developed thus far under Indiana law.

D.S.I. contends that *State Wide Aluminum, Inc. v. Postle Distributors Inc.*, 626 N.E.2d 511 (Ind.Ct.App.1993), *trans. denied*, and *State ex rel. Prosser v. Indiana Waste Systems, Inc.*, 603 N.E.2d 181 (Ind. Ct.App.1992), compel the result that Natare is not a "prevailing party" within the meaning of IC § 34–52–1–1. In *State Wide Aluminum, Inc.*, this court noted that any ambiguity in subsection (b) concerning the meaning of "prevailing party" is resolved by subsection (a) of IC § 34–52–1–1. That subsection provides, "In all civil actions, the party recovering judgment shall recover costs...." Therefore, as we clarified in *State ex rel. Prosser v. Indiana Waste Systems, Inc.*, 603 N.E.2d 181, a prevailing party is one that recovers a judgment. In both *State Wide Aluminum, Inc.* and *Prosser*, this court determined that the party seeking attorney fees was not a "prevailing party" within the meaning of IC § 34–52–1–1. In *State Wide Aluminum*, the requesting party claimed that it had received a judgment when its opponent failed to pursue a motion to appoint a receiver. In *Prosser*, the requesting party claimed that it received a judgment when it successfully opposed the opponent's motion for recusal of the judge. This court determined in both cases that the party requesting attorney fees lacked the same criterion; it had not obtained a judgment. In so holding, we determined that a ruling on a motion is not a "judgment" within the meaning of IC § 34–52–1–1(a).

We do not perceive a conflict between the holdings in *Tioga Pines Living Center, Inc.* and *Dickinson*, on one hand, and *State Wide Aluminum* and *Prosser* on the other. In fact, we are satisfied that these holdings and principles are not only compatible, but also complementary. Consistent with *Tioga Pines Living Center, Inc.* and *Dickinson*, a party is a "prevailing party" within the meaning of IC § 34–52–1–1, if that party successfully prosecutes its claim or asserts its defense. According to *State Wide Aluminum* and *Prosser*, the requisite successful litigation must culminate in a judgment. According to *Tioga Pines Living Center, Inc.* and *Dickinson*, the judgment alluded to in *State Wide Aluminum* and *Prosser* may take the form of an agreed entry or stipulation, so long as it resolved the dispute generally in the favor of the one requesting attorney fees and altered the litigants' legal relationship in a way favorable to the requesting party. In conducting the latter inquiry, we are to focus upon the requisite judgment in the specific context of the substance, issues, and nature of that particular litigation.

■ Applying these principles, Recreonics originally filed an unrelated lawsuit against Mart individually to enjoin him from making disparaging and defamatory remarks about Recreonics. In 1996, Mart's company, D.S.I., actively solicited from bankruptcy creditors of Recreonics the assignment of their claims against Recreonics. After it obtained such rights from more than twenty-three creditors, D.S.I. filed a complaint against Natare seeking to recover assets that D.S.I. asserted had been misappropriated from Recreonics by Natare prior to the time that Recreonics filed for bankruptcy. Thereafter, D.S.I. engaged in a letter-writing campaign, the primary effect of which was to impugn Natare's legal and financial status, viability, and business practices among Natare's customers. Natare counterclaimed and filed for a preliminary injunction against Mart, D.S.I., and A.R.S., which the trial court granted, and then later vacated. The litigation between the parties culminated in a February 24, 1998 settlement agreement. Pursuant to the

agreement, D.S.I. agreed to withdraw the lawsuit against Natare, and also agreed to the entry of a permanent injunction along the lines of the preliminary injunction that had been vacated earlier.

Viewed in the context of the entire litigation, pursuant to the result of the terms of the settlement agreement, Natare ultimately succeeded in defending against D.S.I.'s original lawsuit, and succeeded in obtaining a permanent injunction that prevented Mart from engaging in the behavior that had been the subject of the 1991 and 1997 preliminary injunctions. In other words, the litigation culminated successfully for Natare in a judicial order that altered the litigants' legal relationship in a way favorable to Natare.

We are satisfied that, under synthesized analyses of *Tioga Pines Living Center, Inc., Dickinson, State Wide Aluminum,* and *Prosser,* Natare was a "prevailing party" within the meaning of IC § 34–52–1–1, and therefore satisfied that criterion of eligibility for attorney fees.

### 2.

■ D.S.I. contends that the trial court erred in determining that D.S.I.'s lawsuit was groundless, frivolous, unreasonable, or brought in bad faith. We review de novo a trial court's legal conclusion that a party litigated in bad faith or pursued a frivolous, groundless or unreasonable claim or defense. *Brant v. Hester,* 569 N.E.2d 748 (Ind.Ct.App.1991).

■ As set out previously, IC § 34–52–1–1(b) provides that, as a prerequisite to a recovery of attorney fees, the prevailing party must show that its opponent (1) brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless; (2) continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or (3) litigated the action in bad faith. In setting out its findings and conclusions in the instant case, the trial court did not specify which of the three grounds set out in subsection

(b) supported the award of attorney fees. However, because the statute lists the grounds in the disjunctive, a litigant is required to demonstrate the existence of only one in order to justify an award of attorney fees. Accordingly, based upon our conclusion that the evidence supports the conclusion that D.S.I.'s lawsuit was frivolous, our analysis will focus upon that question.

■ A claim is "frivolous," for purposes of the attorney fee statute, if it is made primarily to harass or maliciously injure another, if counsel is unable to make a good faith and rational argument on the merits of the claim, or if counsel is unable to support the action by a good faith and rational argument for extension, modification, or reversal of existing law. *Fisher v. Estate of Haley,* 695 N.E.2d 1022 (Ind.Ct. App.1998). Again, because the elements are listed in the disjunctive, proof of one will suffice to support a conclusion that a claim was frivolous.

■ We need not repeat in detail facts that have been thoroughly discussed previously in this opinion. A brief review of the relevant facts reveals that Mart was enjoined by Recreonics, of which Walsh was a part owner at the time, from undertaking tortious and defamatory conduct against Recreonics. Thereafter, Walsh split from Recreonics and his former partner, McNeeley, and formed Natare. McNeeley and Recreonics thereafter filed suit against Walsh and Natare, claiming that Walsh had misappropriated the Recreonics name. Shortly thereafter, Recreonics filed for bankruptcy, and the trustee decided not to pursue the litigation against Natare. The court eventually approved the trustees' recommendation that all of the assets of Recreonics, including its lawsuit against Natare, should be sold to Jones. Mart thereafter actively solicited Recreonics's creditors, asking them to assign to D.S.I. any rights they might have against Recreonics. Having attained such an assignment from at least twenty-three creditors,

D.S.I. filed the instant action against Natare.

It is undisputed that Mart, D.S.I., and A.R.S. are in business of providing aquatics equipment and supplies, and not collections. In fact, the collection effort against Natare was the only foray into that arena taken by Mart or either of his companies. In the course of litigation that followed, Mart drafted all of the communications that were disseminated to third parties concerning the litigation, yet he deliberately concealed his role in the proceedings from others whom he contacted. Instead, all communications purportedly emanated from D.S.I. The communications were directed to Natare's customers, and not to the parties who purportedly had a stake in the outcome of the lawsuit, i.e., the creditors that had assigned their rights against Recreonics to Mart and D.S.I. The tone of the communications, which admittedly were drafted by Mart, was harsh and highly critical of both Walsh and Natare, as well as their business practices.

After D.S.I. obtained a questionable, and ultimately invalid, default judgment against Natare, Mart immediately drafted a "press release" and sent it to Natare's customers, informing them of the judgment and advising them that D.S.I. stood ready to meet their aquatic needs. Mart sent out a second release advising of the judgment two days later, which was two days *after* D.S.I.'s attorney appeared in court to challenge the setting aside of default judgment against Natare. It was not until twelve days after the trial court set aside the default judgment that Mart sent a letter to Natare's customers informing them of that fact. Moreover, that letter was highly critical of Walsh personally and predicted sure defeat for Walsh and Natare in defending against D.S.I.'s lawsuit. Meanwhile, Mart made no effort to contact the true parties-in-interest, i.e., the assignors of rights upon which the lawsuit was based, of the default judgment and the setting aside thereof.

These facts support the conclusion that D.S.I.'s actions in pursuing this lawsuit were undertaken primarily for the purpose of harassing or maliciously injuring Walsh and Natare. As such, the lawsuit was "frivolous" within the meaning of IC § 34–52–1–1(b)(1) and (2). Therefore, the trial court did not err in awarding attorney fees on that basis.

3.

The court concluded that Mart was personally liable to pay the attorney fees assessment. The finding of fact related to that ruling states:

> The Court further finds that the activities of Mart, DSI, ARS, and their counsel Messrs. Einterz and Deckard, were coordinated and organized for a common purpose to benefit Mart and his companies at the expense of Natare. DSI and ARS share office space and other business facilities. Mart was unable to recall which company paid for the distribution of DSI's press release and thus was unable to demonstrate that he had segregated the two companies' business operations. In performing these activities, Mart shared business information of DSI and ARS and used such information for the exclusive benefit of ARS, even when it appeared to be against the business interests of DSI to do so. Additionally, the Court finds that Mart, as the president and sole shareholder of both DSI and ARS, was acting as the representative and agent of both DSI and ARS. Accordingly, the Court concludes that the respective corporate existences of DSI and ARS should be disregarded for the purposes of assessing attorney fees under Indiana Code § 34–52–1–1.

*Record* at 918. Mart contends that the trial court erred in making him personally liable for paying the attorney fees award.

Although we are generally reluctant to disregard a corporate entity, we will do so to prevent fraud or unfairness to third parties. The burden is on the party seeking to pierce the corporate veil to

establish "that the corporation was so ignored, controlled or manipulated that it was merely the instrumentality of another, and that the misuse of the corporate form would constitute a fraud or promote injustice." *Commissioner, Indiana Dep't of Envtl. Mgmt. v. RLG, Inc.*, 735 N.E.2d 290, 294 (Ind.Ct.App.2000) (quoting *Gurnik v. Lee*, 587 N.E.2d 706, 710 (Ind.Ct. App.1992)). In determining whether a party has met this burden, our inquiry is fact sensitive. In so doing, we will examine several factors, including the following:

> (1) [U]ndercapitalization; (2) absence of corporate records; (3) fraudulent representations by corporate shareholders or directors; (4) use of the corporation to promote fraud, injustice or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form.

*Hart v. Steel Prod., Inc.*, 666 N.E.2d 1270, 1277 (Ind.Ct.App.1996), *trans. denied.* All factors need not be present in order to support a decision to pierce the corporate veil. *See Aronson v. Price*, 644 N.E.2d 864 (Ind.1994).

■ The facts set out previously in this opinion support the trial court's decision to pierce the corporate veil with respect to Mart. Mart was the president and sole stockholder of both D.S.I. and A.R.S. In connection with the litigation against Natare, Mart clearly was the one who decided what actions to undertake. Moreover, except for the fact that his attorneys represented him in all legal matters before the court, Mart was solely responsible for implementing those decisions. In so doing, Mart prepared and disseminated deliberately inaccurate and highly defamatory "information" about the litigation to third parties. We have previously affirmed the

trial court's conclusion that the lawsuit was frivolous and Mart pursued the litigation primarily in order to harass or maliciously injure Walsh and Natare. We conclude that, in view of these facts, injustice would result if Mart escaped responsibility for his actions by shielding himself from personal liability and placing the responsibility for those actions on his corporations. The trial court did not err in making Mart personally liable for the assessment of attorney fees.

4.

D.S.I. contends that the trial court erred in awarding Natare $75,000 in attorney fees.

■ The amount of an attorney fees award is left to the sound discretion of the trial court, and we will reverse such an award only upon a showing of abuse of discretion. *Castlewood Prop. Owners Ass'n v. Trepton*, 720 N.E.2d 10 (Ind.Ct. App.1999). An abuse of discretion occurs only when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* Finally, there must be evidence supporting the trial court's award. *Id.*

■ In support of its claim for attorney fees, Natare submitted detailed billing records reflecting services rendered by its counsel, and the cost thereof. Natare also presented expert testimony from attorney Wayne Turner, who did not represent Natare at any time in the instant litigation. Turner examined the nature of the litigation and the fees charged by Natare's counsel, and expressed his opinion that Natare's legal fees were reasonable. This evidence was sufficient to support the trial court's conclusion with respect to the amount of the attorney fees award.

The trial court did not abuse its discretion in order the appellants to pay $75,000 in attorney fees to Natare.[5]

5. In so holding, we reject two other contentions advanced by the appellants in arguing that the award was erroneous. First, D.S.I.

contends that the award must be reversed because the trial court did not explicitly state that the amount was reasonable. Under the

5.

Natare asks this court to order the appellants to pay Natare's attorney fees.

Under certain circumstances, this court has the discretion, pursuant to Indiana Appellate Rule 15(G), to award damages in addition to those awarded by the trial court. Specifically, Rule 15(G) provides: "If the court on appeal affirms the judgment, damages may be assessed in favor of the appellee not exceeding ten percent (10%) upon the judgment, in money judgments, and in other cases in the discretion of the court; and the court shall remand such cause for execution." Accordingly, a discretionary award of damages may be proper when an appeal is permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay. *Garage Doors of Indianapolis, Inc. v. Morton,* 682 N.E.2d 1296 (Ind.Ct.App.1997), *trans. denied.* We must use extreme restraint when exercising our discretionary power to award damages on appeal, however, because of the potential chilling effect upon the exercise of the right to appeal. Thus, we will not impose such sanctions to punish lack of merit unless the appellant's contentions and argument are utterly devoid of all plausibility. Moreover, we have the authority to award attorney fees pursuant to IC § 34–52–1–1 when a party continues to litigate a claim after it becomes frivolous, unreasonable or groundless. *See Garage Doors of Indianapolis, Inc. v. Morton,* 682 N.E.2d 1296.

For purposes of appellate attorney fees, we are mindful that the issues presented in this appeal, although related, are distinct from those that were litigated in the underlying action. We have found that D.S.I.'s actions in pursuing the underlying action were initiated and pursued with bad motives. The attorney fees question, however, represents a separate and distinct phase of the litigation. We cannot say that the appellants' contentions on the issues presented in this appeal rise to the level of implausibility that would warrant an award of attorney fees under Appellate Rule 15(G). *See Greasel v. Troy,* 690 N.E.2d 298 (Ind.Ct.App.1997).

Judgment affirmed and request for appellate attorney fees denied.

DARDEN, J., and BARNES, J., concur.

---

circumstances, the trial court clearly implied that the award was reasonable. *Cf. Emergency Physicians of Indianapolis v. Pettit,* 714 N.E.2d 1111 (the appellate court may view an order of attorney fees based upon frivolous, unreasonable, and groundless defenses as an implicit conclusion that the defenses in question were improper in those respects). Second, the appellants assert that the award of attorney fees was improper because Natare failed to link the fees reflected on the billing records with particular actions undertaken by counsel to defend against the actions that the trial court found were frivolous and unreasonable. To the contrary, the billing records adequately reflect that Natare's legal costs were incurred as a result of legal actions undertaken by D.S.I., A.R.S. and Mart that were ultimately determined to be frivolous because they were motivated by bad faith.