**Paula Jo WAGNER, Appellant–Defendant,**

**v.**

**Roy E. SPURLOCK, Jr., as Trustee of the Roy E. Spurlock, Sr. Irrevocable Trust Agreement and Roy E. Spurlock, Jr., and Susan Erwin–Toma, Individually, Appellees–Plaintiffs.**

No. 45A03–0303–CV–86.

Court of Appeals of Indiana.

Feb. 26, 2004.

David M. Henn, Stowers Weddle & Henn, Indianapolis, IN, Attorney for Appellant.

Curtis E. Shirley, Indianapolis, IN, James T. Walker, James W. Martin, Martin & Martin, Merrillville, IN, Attorneys for Appellees.

## OPINION

BAKER, Judge.

This appeal arises from an action to enforce a settlement agreement obtained through mediation.  Appellant-defendant

Paula Jo Wagner (Paula) appeals the judgment entered in favor of the appellees-plaintiffs, Roy E. Spurlock, Jr., (Roy) and Susan Erwin–Toma (collectively, the appellees) in an amount of $139,791.98 plus post-judgment interest. The parties in this appeal are all children of the decedent, Roy E. Spurlock, Sr. (Spurlock). Raising a number of issues, Paula contends that (1) a general release executed by the parties in accordance with a settlement agreement barred any additional claims by the appellees for amounts that were allegedly owed to them under a trust created by Spurlock; (2) the trial court erroneously entered an order for a "constructive dividend" from a corporation when such a remedy was not provided for in the settlement agreement; (3) the trial court erred in ordering Paula to pay attorney fees to the appellees; (4) Paula was erroneously ordered to pay Roy an amount for wages because she was not his employer and, thus, Roy's claim did not fall within the purview of Indiana's wage statute; (5) the trial court erred in ordering Paula to reimburse the appellees' legal counsel in the amount he paid Paula's attorney to settle a claim for malicious prosecution that had been lodged against him; and (6) the finding that Paula perpetrated a fraud upon the appellees was not supported by the evidence.

Concluding that the trial court erred in ordering Paula to reimburse the appellees' counsel for the settlement amount that was paid to Paula's attorney on the malicious prosecution claim, we reverse that portion of the judgment. We also remand this case to the trial court so that it may hear additional evidence as to the amount of appellate attorney fees to which the appellees may be entitled and to calculate the post-judgment interest that is due and owing. Finding that no reversible error occurred with respect to the remaining issues, we affirm in part, reverse in part, and remand this cause to the trial court for further proceedings consistent with this opinion.

## FACTS

The facts most favorable to the judgment are that Spurlock, a resident of Lake County, died on June 2, 1998. He was a widower and is survived by his three children, Paula, Roy and Susan.

During Spurlock's lifetime, he owned the majority stock in B & B Corporation, Fabricators Corp. (Fabricators), and Schererville Steel Corp. (Schererville). Spurlock had executed a will that called for distribution of his property into a testamentary trust for 15 years in equal shares to his three children. Spurlock also funded a 1990 irrevocable trust that contained majority control of B & B. This corporation owned the real estate that Schererville and Fabricators used. Spurlock signed this irrevocable trust agreement on October 29, 1990, wherein he appointed Paula as trustee. The terms of the trust provided that all of his children were to be treated equally.

Spurlock funded this trust with sixty shares of B & B's common stock, and the trust was to provide quarterly income to Spurlock's children along with a right to invade the trust for their health, maintenance and support. When trouble brewed regarding Paula's handing of the assets, the appellees filed a petition for the removal of Paula as the trustee, and to require an accounting. The Lake Circuit Court ultimately granted the petition on July 29, 1999, and Paula was removed.

Spurlock funded a July 17, 1997 trust for the benefit of Susan with two shares of Schererville Steel's common stock. Attorney R. Brian Woodward and his law firm had represented Spurlock and his corporations. Specifically, Woodward drafted and supervised the signing of Spurlock's estate

planning documents and supervised the legal operations of the corporations. Woodward also represented Paula by drafting her power of attorney for Spurlock, by representing the trust over which Paula was the trustee, and by representing her interests as the beneficiary of Spurlock's estate plans and agreements.

On April 1, 1998, Spurlock purportedly signed a new revocable trust agreement with Paula as trustee. Additionally, in accordance with a stock purchase agreement, Spurlock purportedly sold all of his stock in Fabricators to Paula for $150,000, to be paid in equal installments over twenty-five years and bearing interest at the rate of 8%. Under this agreement, Paula purportedly sold to herself all of the stock in Schererville Steel for $1,294,995, to be paid in equal installments over a period of twenty-five years and bearing interest at the rate of eight percent. Spurlock apparently rendered his approval, and both stock purchase agreements were to be secured by a promissory note and pledge agreement. Susan and Roy apparently had no knowledge that Paula executed any of the documents.

Thereafter, on May 7, 1998, Woodward wrote Susan stating that the two shares of Schererville Steel were valued at $10,000. Then, on July 1, 1998, approximately one month after Spurlock's death and two months after the letter had been written, Paula offered to purchase Roy's three and one-third shares for $6,666.66.

On August 11, 1999, the appellees filed a complaint against Paula and others for breach of trust, conversion, negligence of an attorney and an accountant, and for the rescission of a stock purchase agreement that gave Paula control of Spurlock's corporations.[1] The allegation for breach of trust complained that Paula, Woodward and others wrongfully depleted trust assets, damaged the trust, and deprived the appellees of income that was owed to them. The complaint further alleged that Paula, along with others, misappropriated Spurlock's property, committed waste, engaged in self-dealing and committed fraud. All of Paula's actions were allegedly accomplished with the assistance of Woodward and the accountant who worked with the Spurlock finances.

It was eventually revealed that Spurlock funded various trusts that afforded Paula control over corporate assets for much less than their fair market value. Specifically, Schererville Steel was valued at nearly $2,464,983, and Paula purchased it for $1,294,995 with payment terms over the next twenty-five years at an interest rate of 8%. Fabricators was worth nearly $417,650, and Paula bought that corporation for $150,000 under the same terms.

After the complaint was filed, the parties appeared for mediation and signed a handwritten agreement, with settlement contingent on Paula obtaining the necessary financing to pay Roy and Susan $1.7 million. The parties adjourned the mediation upon memorializing the settlement that was signed by all the parties. The agreement also contained mutual releases, dismissals, non-compete agreements, and other standard provisions. As part of the agreement, Paula agreed to continue paying Roy his salary as a full-time employee in Schererville's shop. Once Roy and Susan received their inheritance, however, the agreement provided that Roy would resign or retire from Schererville Steel and forego any grievances that he may have had against the union.

On July 25, 2000, the parties signed a typed settlement agreement, and Paula transferred $1,642,500 to the appellees.

---

1. The complaint was amended on September 13, 1999.

Of this amount, the appellees' legal counsel, Curtis Shirley, retained $200,000 in his trust account in the event that additional taxes would be assessed. Although Paula eventually transferred the money, the settlement agreement contained a number of provisions that required further attention.

It was determined that the appellees were to receive $200,000 when the IRS sent a closing letter showing that Spurlock's estate did not owe any additional taxes. While the letter from the IRS was sent on October 30, 2000, indicating that no further taxes were due and owing, the appellees did not receive that correspondence until December 28, 2000. While Paula was aware that the estate tax amount was final, she did not disclose that information to the appellees. Instead, Paula had sent a new settlement proposal to Roy as to how the amount held in escrow should be distributed. In essence, Paula wanted to be paid $100,000 and in exchange, "Roy, Jr. and Susan [would] not be responsible for any increase in the net estate taxes, interest or penalties." Appellee's Br. p. 3. By then, however, Paula was aware that there would be no increase in estate taxes, interest or penalties. In light of Paula's actions, the appellees did not receive the $200,000 disbursement until January 4, 2001, instead of on November 1, 2000.

As set forth above, Paula agreed to continue paying Roy the amount of $1,000 per week for his employment at Schererville until the $1.7 million was fully paid. Roy was owed $2,098.80 which was payable by August 8, 2000. However, Paula did not pay Roy until May 16, 2001. The parties were also to docket the grandchildrens' trust, choose new trustees, and divide the "cash on hand" and trust property among the children.

The appellees subsequently filed a petition to enforce the agreement on September 11, 2000, and the trial court ultimately entered an order compelling the parties to comply with the negotiated settlement agreement. Thereafter, a bench trial was conducted that concluded on October 4, 2002. Shortly before the trial commenced, however, Woodward threatened to sue Roy and his attorneys for malicious prosecution. In response, Shirley and Woodward negotiated a written release, whereby Shirley was to pay a sum of $6000 to Woodward. On the first day of trial, Paula's legal counsel delivered a check in the amount of $57,500, purportedly representing her redemption or purchase of the shares of stock that was required for Paula's distribution of the trust assets to Spurlock's grandchildren. In accordance with the trial court's judgment that was issued on February 7, 2003, Paula was ordered to pay the following amounts to the appellees:

$2,667.00 for lost interest, and a punitive amount of $8,001.00 because of the issues involving the $200,000.00 held in escrow;

$5,917.78 in penalties and interest, and $5,000.00 in attorney fees because of the issues involving [Paula's] failure to timely pay Spurlock his wages;

$7,667.00 in interest on [Paula's] failure to timely pay the $57,000.00 held in escrow;

$59,239.20 as the Spurlock childrens' share of the dividends that should have been (and perhaps are) in the grandchildrens' trust;

$6,000.00 paid to Mr. R. Brian Woodward (and $300.00 in interest) for what was otherwise covered under the Agreement; and

$30,000.00 in other attorney fees for those matters that did not involve the Wage Payment Statute.

Appellant's App. p. 15.

In sum, judgment was entered against Paula in favor of Roy and Susan in the

amount of $72,885.78 plus post judgment interest at the rate of eight percent. Additionally, judgment was awarded to Roy for the benefit of his children's share of the grandchildren's trust in the amount of $66,906.20 plus post judgment interest. That amount was to be used along with the $57,500 that had already been transferred to fund the children's share of the grand-childrens' trust. Appellant's App. p. 16. Paula now appeals.

## DISCUSSION AND DECISION

### I.   Standard Of Review

When, as here, the trial court enters findings of fact and conclusions thereon upon the request of a party pursuant to Indiana Trial Rule 52, we apply the following standard of review: we must determine whether the evidence supports the findings and whether the findings support the judgment. *CSX Transp., Inc. v. Rabold*, 691 N.E.2d 1275, 1277 (Ind.Ct.App. 1998), *trans. denied.* The court's findings and conclusions will be set aside only if they are clearly erroneous, that is, that the record contains no facts or inferences supporting them. *Id.* A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Id.* We neither reweigh the evidence nor assess the credibility of witnesses, but consider only the evidence most favorable to the judgment. *Ahuja v. Lynco Ltd. Medical Research,* 675 N.E.2d 704, 707 (Ind.Ct.App.1996), *trans. denied.* Special findings, even if erroneous, do not warrant reversal if they amount to mere surplusage and add nothing to the trial court's decision. *Baker v. R. & R. Const., Inc.,* 662 N.E.2d 661, 666 (Ind.Ct.App.1996), *trans. denied.*

### II.   Wagner's Contentions

### A.   Total Bar of Claims Against Wagner

Paula argues that the trial court erred in awarding damages to the appel-

lees because the judgment was in derogation of the settlement agreement. In essence, Paula claims that the general release language contained in the agreement barred any subsequent claims for additional funds that were allegedly owed to the trust.

In resolving this issue, we note that if the language of a contract is unambiguous, the intent of the parties is determined from the four corners of the document. *Stemm v. Estate of Dunlap,* 717 N.E.2d 971, 975 (Ind.Ct.App.1999). A contract is ambiguous only where a reasonable person could find its terms susceptible to more than one interpretation. *Id.* Further, it is only where a contract is ambiguous and its interpretation requires extrinsic evidence that the fact finder must determine the facts upon which the contract rests. *Zollman v. Geneva Leasing Assoc., Inc.,* 780 N.E.2d 387, 391–92 (Ind. Ct.App.2002).

In this case, Paula points to the following provisions set forth in the settlement agreement that purportedly operate to release her from the claims brought by the appellees in this action:

4.   Roy and Susan accept the foregoing property in full and complete settlement of all allegations which were or could have been raised against Paula and Joel Wagner, any companies named herein, the estate, all trusts named herein and Paula in her capacity as officer and director of any corporations named herein and reasonable documents in the decedent's Estate, Trust and corporations herein presented by a party which are reasonably calculated to minimize any tax consequences to the presenting party so long as such documents do not compromise the signing party's tax position.

5. Roy and Susan release and discharge forever, jointly and severally, Paula, Joel Schererville Steel Corporation, R.E. Spurlock, Inc., Fabricators Corporation, all trusts named herein and the estate of Roy E. Spurlock, Sr., together and including all partners, employees, agents, representatives, successors and assigns, from any, every and all claims, demands or causes of action accruing, arising, growing out of, or connected with the allegations made in the above captioned cases. Paula releases and discharges forever, jointly and severally, Roy and Susan, their spouses, their agents, representatives, successors and assigns, from any, every and all claims, demands or causes of action accruing, arising, growing out of, or connected with the allegations made in the above captioned cases.

Appellant's App. p. 29–30.

While Paula makes much of the above "general release" language, it is apparent that such provisions did not release Paula from her obligations under the settlement agreement. To be sure, the evidence showed that Paula failed to satisfy the terms of the settlement, and she is therefore estopped from arguing that she did not have to comply with the original terms. To support her argument, Paula posits that the appellees, with the assistance of counsel, knowingly and voluntarily entered into a valid settlement agreement, but now are requesting that they be permitted to renew their attack on Paula. Appellant's Br. p. 10. Inasmuch as the appellees agreed to settle and release "all claims," Paula contends that the trial court erred in awarding damages.

Contrary to Paula's argument, this court has previously determined that we have jurisdiction to consider and address breaches of settlement agreements. *See Gary v. Peters,* 583 N.E.2d 1213, 1215–16 (Ind.Ct.App.1991). This court has held that the remedy of specific performance is appropriate in some instances. *Germania v. Thermasol,* 569 N.E.2d 730, 731–32 (Ind. Ct.App.1991). Here, the evidence at trial demonstrated that Paula failed to comply with the trial court's order of December 11, 2000, regarding the terms of the agreement and the direction that the parties were to comply with it. As the instant case pertained to the enforcement of the settlement agreement, Paula may not successfully complain that the trial court lacked the authority to enter a judgment as to her noncompliance with that agreement. Thus, there was no error with respect to this issue.

### B. Claim For Constructive Dividend

■ Moving to the specifics, Paula argues that the appellees' claim for a constructive dividend may not stand because the settlement agreement specified only that the parties were to divide the "cash on hand" in the trust. Thus, Paula urges that the appellees' claim for this amount improperly extended the scope of the settlement agreement beyond that which the parties had intended.

Again, we note that the intent of the parties is determined from the four corners of the contract so long as the language of the instrument is unambiguous. *Stemm,* 717 N.E.2d at 975. Here, Paula urges that the division of "cash on hand" as set forth in the Settlement Agreement was limited to "ready money—assets that are liquid, on hand and available for delivery." Appellant's Br. p. 13. That said, Paula maintains that the trial court erroneously determined that she was liable for a "constructive dividend" from Schererville in the amount of $148,098. Notwithstanding this contention, there is no evidence demonstrating that the trial court compelled any of the corporations to declare a dividend. When Spurlock established the

trust for the benefit of his grandchildren in 1992, he funded that trust with shares of Schererville stock that had declared dividends in the past.

Under the settlement agreement, Paula agreed to divide the trust property equally among the grandchildren. After the settlement, Paula became the majority shareholder and president of Schererville without any threat of the shares being returned to the estate and without the trial court having to appoint a receiver. Additionally, the parties could not do anything to compromise the grandchildrens' trust.

It was established that while Fabricators had a minimal value, that corporation issued several times that amount in dividends over the years. There was testimony at trial suggesting that the dividends should be distributed from Fabricators so dividends would not have to be paid to the shareholders of Schererville Steel. Appellees' App. p. 262. Under the circumstances, it was reasonable for the trial court to infer that Paula orchestrated the issuance of dividends from Fabricators instead of Schererville to effectively diminish the grandchildrens' inheritance.

We also note that Shirley testified during cross-examination that:

> The dividends are due from Paula. Paula was trustee of the grandchildrens' trust. Paula is a party to this agreement. Paula owes the money, Paula has to sign the check. Now, if she wants to take it from the corporation or from her personal checking account, I don't care. It's her signature and her agreement. She owes the money.

Appellee's App. p. 473. Shirley went on to acknowledge that "cash on hand" included whatever property was in the grandchildrens' trust. Appellees' App. p. 480. The settlement agreement mentioned that the grandchildrens' trust had such cash on hand. For these reasons, we cannot say

that the trial court erred in determining that Paula was liable to pay the "constructive dividend" from Schererville.

### C. Liability of Corporate Officer For Wage Claim

█ Paula next contends that the trial court's award to Roy in the amount of $5,917.78 representing his lost wage claim from Schererville along with statutory penalties and interest plus $5,000 in attorney fees with respect to that claim must be set aside. In essence, Paula claims that she is not liable for Roy's wages, liquidated damages or attorney fees because she was not Roy's employer and because he was not engaged in employment in return for his weekly payment.

Indiana Code section 22–2–5 et seq. requires employers in this State to pay their employees wages in full, regularly, and on time. This court has determined that wages are something akin to the wages paid on a regular, periodic basis for regular work performed by the employee. *Wank v. St. Francis College*, 740 N.E.2d 908, 912 (Ind.Ct.App.2000), *trans. denied.* To qualify as a wage, the compensation must be connected to the work performed by the employee. *Id.* Relevant to our resolution of this issue is Indiana Code section 22–2–5–2 which provides as follows:

> Every such person, firm, corporation, limited liability company, or association who shall fail to make payment of wages to any such employee as provided in section 1 of this chapter shall, as liquidated damages for such failure, pay to such employee for each day that the amount due to him remains unpaid ten percent (10%) of the amount due to him in addition thereto, *not exceeding double the amount of wages due,* and said damages may be recovered in any court having jurisdiction of a suit to recover the amount due to such employee, and in

any suit so brought to recover said wages or the liquidated damages for nonpayment thereof, or both, the court shall tax and assess as costs in said case a reasonable fee for the plaintiff's attorney or attorneys.

(Emphasis added).

The portion of the settlement agreement dealing with Paula's obligation to pay Roy his wages states:

> Paula shall pay Roy $1,000 for the week of July 10–14, 2000, and shall pay Roy $1,000 per week afterwards, prorated until the day the Agreement is signed and $1.7 million (less $57,5000) is transferred. The payment shall be made within fourteen (14) days hereof.

Appellant's App. p. 33. Under this paragraph, Roy asserts that he is entitled to statutory liquidated damages and attorney fees incurred in pursuing the unpaid amount because he should have received a paycheck in accordance with the agreement. On the other hand, Paula claims that the payments were to come from Schererville, who was actually Roy's employer. Thus, Paula maintains that the claim should have been lodged against the corporation and not her personally.

Contrary to Paula's argument on appeal, she acknowledged in the settlement agreement that she understood that she was to send Roy a weekly paycheck until the settlement was finalized. Paula does not dispute that she owed Roy $2,098.80 on or before August 8, 2000. It is apparent that the purpose was continued employment so that if Paula failed to fund or finalize the settlement, Roy had not waived any right to continued employment and benefits. Moreover, Paula signed the mediation agreement, thus obligating herself to assure that Roy would continue to receive a check and his benefits on a regular basis. Paula personally guaranteed this performance, and the settlement agreement established that Wagner should have continued to pay Roy his wages. That said, the evidence showed that Paula failed to pay Roy his wages that were due and owing. As a result, the $5917.78 award to Roy—which included penalties and interest—fell within the ambit of Indiana Code section 22–2–5–2. Therefore, the trial court did not err in awarding Roy this amount on his claim for unpaid wages.

### D. Paula's Payment to Opposing Counsel for Settlement of a Malicious Prosecution Action

Paula next contends that the trial court erred in ordering her to reimburse Shirley for the sums he paid to Paula's counsel to settle a claim of malicious prosecution against Shirley. In support of this contention, Paula points out that it is "illogical and legally impossible that [she] somehow is responsible for any attorney committing the tort of malicious prosecution, let alone the attorney opposing her." Appellant's Br. p. 19.

In *Bowling v. Popp*, we discussed the duty of a private citizen to control the conduct of another:

> [T]he courts of Indiana generally follow the principles set forth in the Restatement (Second) of the Law on Torts. *See, e.g., Sports, Inc. v. Gilbert* (1982, Ind.App.), 431 N.E.2d 534. The basic principle of this duty is stated as follows:
>
> There is no duty to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

536 N.E.2d 511, 515 (Ind.Ct.App.1989).

Here, the trial court made the following entry with respect to this portion of the

judgment: "92. For breach of the Agreement, and failure to comply with the Court's December 11, 2000 order granting the petition to enforce the Agreement, Paula must pay ... the additional $6000 as compensatory damages...." Appellant's App. p. 14. In examining this particular entry, we do not see that any "special relation" existed between Shirley and Paula that might impose a duty upon Paula to control Shirley's conduct. To be sure, Shirley's relationship to Paula was adversarial. Shirley was not a party to this litigation and never filed a complaint in his own name for the claim against Paula for his malicious prosecution settlement. No evidence was offered at trial as to how Paula's delay in complying with the settlement agreement allegedly forced Shirley into committing the tort of malicious prosecution. That said, we must conclude that there was no basis in law or fact for the judgment against Paula in the amount of $6000 plus interest for Shirley's payment of funds to Woodward for settlement of the malicious prosecution claim. As a result, we reverse this portion of the judgment.

### E. Fraud

■ Finally, Paula argues that the trial court's determination that she perpetrated a fraud upon the appellees must be set aside. While Paula does not challenge the amount of the award for these damages, she maintains that the evidence compels a different result because no evidence was offered to support a finding that Paula had instructed the bank to withhold certain information from the appellees regarding the trust.

In addressing this issue, we note that constructive fraud arises by operation of law from a course of conduct that, if sanctioned by law, would secure an unconscionable advantage, irrespective of the actual intent to defraud. *Drudge v. Brandt,* 698

N.E.2d 1245, 1250 (Ind.Ct.App.1998). This theory of fraud is based on the premise that there are situations that might not amount to actual fraud, but which are "so likely to result in injustice that the law will find a fraud despite the absence of fraudulent intent." *Scott v. Bodor, Inc.,* 571 N.E.2d 313, 324 (Ind.Ct.App.1991).

Additionally, to maintain an action for actual fraud, there must be: (1) a material misrepresentation of past or existing fact; (2) which is made with knowledge of or reckless disregard for the falsity of the statement; and (3) resulting reliance upon the misrepresentation to the detriment of the relying party. *Drudge,* 698 N.E.2d at 1250.

With respect to the judgment for fraud that had been entered against Paula, the trial court made the following findings and conclusions:

20. [Paula] defrauded [Roy] by failing to inform him of the IRS closing letter, by sending settlement proposals which attempted to compromise the $200,000 amount on the assumption that the estate taxes could be in dispute when they were already settled, and by telling the Bank not to disclose information to [Roy].

21. [Paula] also violated the Court's December 11, 2000 order granting the petition to enforce the Agreement by attempting to take $100,000 from [Roy] under new terms.

22. For this fraud [Paula] is assessed punitive damages of three (3) times the amount of compensatory damages, or an additional $8,001.

Appellees' App. p. 89–92.

As set forth in the *FACTS,* the settlement agreement required counsel for the appellees to escrow $200,000, which they were to receive if the estate did not owe additional taxes. On October 30, 2000 the

Internal Revenue Service sent a closing letter to the executor of Spurlock's estate, Mercantile National Bank, indicating no additional estate tax, penalty or interest was due. Appellees' App. p. 920. The following day, the Bank faxed the closing letter to Paula and her legal counsel. Then, on November 1, 2000, Paula sent a new settlement proposal to Roy regarding how to dispose of the funds held in escrow. Appellees' App. p. 758.

In light of this evidence, the trial court inferred that Paula sent the new proposal on November 1, 2000, for the appellees to receive $100,000 at a time when she already was aware that they were entitled to $200,000 under the agreement. Moreover, Paula did not dispute that on December 28, 2000, the Bank sent a copy of the closing letter concealing the date the IRS sent the letter and the date the Bank received it. The evidence also showed that after a brief inquiry with Bank personnel as to why the closing letter had concealed the dates, a follow-up copy was sent showing the dates that the letter was sent as well as the day that the Bank received it. Shirley acknowledged that the appellees had relied upon the previous representation that there had been no closing letter.

Inasmuch as the Mercantile Bank had nothing to gain by concealing the relevant dates, the trial court could properly infer from this evidence that Paula had the dates concealed so that the appellees would not learn that they had been entitled to the $200,000 that was held in escrow. Therefore, we reject Paula's attempt to place blame upon the appellees by asserting that because "Paula paid attention to matters and took care of her own affairs does not amount to fraud. To find that it does would be to punish those who take affirmative actions and reward those who rest on their rights." Appellant's Br. p. 27. As the trial court had

ordered Paula on December 11, 2000, to specifically perform under the terms of the settlement agreement, it was her obligation to pay the $200,000 once she learned that the estate was not liable for additional taxes. The evidence supports the trial court's determination that Paula's actions amounted to fraud. Thus, there was no error with respect to this issue.

### F. Recovery of Attorney Fees

Paula next alleges that the trial court erred in awarding attorney fees to the appellees in the amount of $30,000. Specifically, Paula asserts that this judgment was erroneous because there was no statute or contract provision on which to base the award.

Generally, litigants must pay their own attorney fees, and therefore, an award of attorney fees is not permitted unless a statute, agreement, or stipulation authorizes the same. *Brademas v. South Bend Comm. School Corp.*, 783 N.E.2d 745, 750 (Ind.Ct.App.2003), *trans. denied.* We note that Indiana Alternative Dispute Resolution Rule 2.7(E)(3) provides that "in the event of any breach or failure to perform under the agreement, upon motion and after hearing, the court may impose sanctions, including entry of judgment on the agreement." Additionally, Indiana Alternative Dispute Resolution Rule 2.10 states "the court may impose sanctions against any attorney, or party representative who fails to comply with these mediation rules, limited of mediation costs and/or attorney fees relevant to the process." Inasmuch as the trial court appropriately considered and applied these provisions to the circumstances in this case, Paula may not complain that the trial court was without authority to award these fees.

We embrace the notion that this court will use extreme restraint when exercising our discretionary power to award attorney fees that are authorized in accordance with

former Indiana Appellate Rule 15(G) (now App. R. 66(E)). *See Lakes and Rivers Transfer v. Rudolph Robinson Steel Company*, 795 N.E.2d 1126, 1135 (Ind.Ct.App. 2003). That is, under this rule, "we will not impose such sanctions to punish lack of merit unless the appellant's contentions and argument are utterly devoid of all plausibility." *D.S.I. v. Natare Corp.*, 742 N.E.2d 15, 28 (Ind.Ct.App.2000) *trans. denied.*

While it is evident here that Paula's appeal is not frivolous or in bad faith, we observe that no damages were awarded in accordance with this rule. Rather, as indicated above, the trial court awarded the challenged attorney fees as part of the appellees' damages pursuant to our Alternative Dispute Resolution Rules. Simply because attorney fees may not be appropriately awarded by this court under our appellate rules, a trial court is not precluded from awarding reasonable fees for an appeal based upon another statute, rule, or agreement allowing for such an award. *Lakes and Rivers Transfer*, 795 N.E.2d at 1135. Inasmuch as the Alternative Dispute Resolution rules apply in this instance and control the award of attorneys fees, Paula has failed to establish error with regard to this issue. Additionally, because the appellees are entitled to be made whole given the settlement agreement provisions, we grant their request for the trial court to hear further evidence regarding entitlement to appellate attorneys fees and to award the same if the circumstances so warrant.

### CONCLUSION

In light of the issues discussed above, we conclude that the trial court properly awarded damages against Paula because she failed to comply with the settlement agreement. That said, the trial court acted within its discretion in ordering Paula to distribute the assets in the trust, including the declaration and payment of "constructive dividends" from Schererville. We further conclude that the award of attorneys fees to the appellees was proper and that Paula was liable for the payment of Roy's wages pursuant to the settlement agreement. Additionally, we note that the evidence was sufficient to support a finding of fraud against Paula, but conclude that the portion of the judgment compelling her to reimburse the sum of $6000 for settlement of the malicious prosecution claim may not stand.

The judgment of the trial court is therefore affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion for the calculation of interest and for the purpose of hearing evidence regarding an additional amount of attorneys fees to which the appellees may be entitled in accordance with our Alternative Dispute Resolution Rules.

NAJAM, J., and MAY, J., concur.