**FAIRFIELD DEVELOPMENT, INC., Donald Martz, Virginia Martz, and Charles Martz, Appellants–Cross Claim Plaintiffs,**

v.

**GEORGETOWN WOODS SENIOR APARTMENTS LIMITED PARTNERSHIP, Appellees–Cross Claim Defendants.**

No. 49A05–0108–CV–347.

Court of Appeals of Indiana.

May 16, 2002.

Andrew W. Hull, Steven J. Moss, Alice M. Morical, Hoover, Hull, Baker & Heath, Indianapolis, IN, Attorneys for Appellant.

Donald A. Tarkington, Stephen J. Siegel, Novack and Macey, Chicago, IL, Jay Jaffe, Brent D. Taylor, Matthew R. Gutwein, Baker and Daniels, Indianapolis, IN, Attorneys for Appellee.

## OPINION

ROBB, Judge.

Fairfield Development, Inc., Donald Martz, Virginia Martz, and Charles Martz (collectively referred to as "Fairfield" where appropriate) appeal from the trial court's judgment in favor of Georgetown

Woods Senior Apartments Limited Partnership ("Georgetown"). We affirm.

### Issues

Fairfield raises several issues for our review, which we reorder and restate as follows:

1. Whether the trial court properly refused to admit into evidence a settlement agreement between the parties;

2. Whether the trial court properly determined that Fairfield was the alter ego of the Martzes; and

3. Whether the trial court properly entered judgment for Georgetown on Georgetown's complaint for breach of contract.

### Facts and Procedural History

Fairfield was formed in 1990 with Donald Martz as president. He was also a director of the corporation, but he has never been a shareholder. In 1991, Donald resigned as president and a director and was no longer officially affiliated with the corporation. Charles Martz, the son of Donald and Virginia Martz, took over as president of Fairfield. Donald and Virginia are also the parents of Lori Grate, Donna Ferrebee, and Michelle Phillips. All four of their children are officers, directors, and shareholders of Fairfield. In addition, Virginia is a director of Fairfield.

On August 23, 1991, Fairfield and Auburn Development Corporation ("Auburn") entered into a joint venture agreement and formed Georgetown Woods Senior Apartments Limited Partnership ("Georgetown") for the purpose of constructing an apartment complex for senior citizens. Fairfield and Auburn were the general partners of Georgetown. On October 8, 1991, Fairfield and Georgetown entered into a contract pursuant to which Fairfield was to be the general contractor for con-

struction of the apartments. On October 25, 1991, First Federal Savings Bank approved a loan request from Fairfield for $2,400,000. The loan commitment was signed by Georgetown, Auburn, Fairfield, Charles Martz, Donald Martz and Virginia Martz. Donald and Virginia Martz signed as personal guarantors of the loan. First Federal also required the execution of an Operating Deficit Agreement. Donald and Virginia Martz also signed the agreement in their individual capacity as guarantors.

Construction began in 1992. As construction neared completion in October 1993, disputes arose over defects in construction allegedly caused by Fairfield. In an attempt to resolve these disputes, Fairfield and Auburn entered into a settlement agreement on November 15, 1993, which terminated the joint venture agreement and provided that Fairfield was to withdraw from Georgetown. Additional facts will be provided as necessary.

### Discussion and Decision

#### I. Admission of Evidence

Fairfield first contends that the trial court erred in refusing to admit into evidence the settlement agreement entered into by the parties on November 17, 1993.

##### A. Standard of Review

The standard of review for admissibility of evidence issues is abuse of discretion. *Butler ex rel. Estate of Butler v. Kokomo Rehabilitation Hosp., Inc.*, 744 N.E.2d 1041, 1046 (Ind.Ct.App.2001), *trans. denied.* "An abuse of discretion occurs only when the trial court's action is clearly erroneous and against the logic and effect of the facts and circumstances before the court." *Medical and Prof'l Collection Servs., Inc. v. Bush*, 734 N.E.2d 626, 631 (Ind.Ct.App.2000). Even if a trial court errs in a ruling on the admissibility of evidence, this court will only reverse if

the error is inconsistent with substantial justice. *Butler,* 744 N.E.2d at 1046.

### B. Admission of Settlement Agreement

Fairfield alleges that it offered into evidence as Exhibit 68 the November 17, 1993, Settlement Agreement between Fairfield and Auburn and that the trial court sustained Georgetown's objection and refused to admit the Settlement Agreement on the basis of relevance. Fairfield further alleges that it then tendered an offer of proof regarding the Settlement Agreement. Georgetown counters that Fairfield did not, in fact, offer the Settlement Agreement into evidence and did not make an offer of proof with respect to the Settlement Agreement. Rather, Georgetown characterizes the proceedings as an objection to Charles Martz's testimony about the Settlement Agreement. On review of the record, we believe that Georgetown has more accurately described the proceedings with respect to the Settlement Agreement: the agreement was never offered into evidence.

■ On direct examination of Charles Martz, the following exchange took place:

Q: And was that settlement agreement intended to properly compensate the two general partners of the Georgetown Woods Limited Partnership?

A: Yes.

[Georgetown's counsel]: Your Honor, I object to the relevance of this question, it's getting in the settlement agreement which has already been adjudicated by this Court.... I think the intention of the parties with respect to that settlement agreement has been decided by the Court.

[Fairfield's counsel]: That would be true, Your Honor, with respect to that issue. However, they have pled alter ego issues ... [a]nd this settlement agreement goes a long way to try and indicate how those issues would be resolved and that's why it's relevant.

* * *

Court: I don't see how it's relevant either, I'll sustain the objection.

[Fairfield's counsel]: Okay. Your Honor, we would make an offer to prove then.

Court: Yes, sir.

[Fairfield's counsel]: Thank you. Your Honor, with respect to that and to make the record clear, would I have the Court's permission to mark this [settlement agreement] so that it's in so that I could refer to it in my offer to prove?

* * *

Court: You may ask the witness what his answer would have been had he been permitted to testify.

[Fairfield's counsel]: Okay. But then he won't have anything to refer to and the record won't have something that I tendered and that would be unclear then....

Court: You hadn't tendered it before you asked him the question.

[Fairfield's counsel]: I understand. But I'm asking the Court for guidance on how you want me to handle this offer to prove.

Court: The production of evidence is up to you.

[Fairfield's counsel]: Okay. Well, then I'll have it marked.

* * *

Q: Mr. Martz, I'll hand you what is marked as Trial Exhibit Number "68" if, pursuant to an offer to prove, if I were allowed to proceed in this direction, Mr. Martz, would ... is that a complete and accurate copy of the settlement agreement that was entered into between [Auburn] and [Fairfield] with respect to the proceeds to be paid by [Georgetown]?

A: Yes.

Q: Well, Mr. Martz, with respect to Trial Exhibit Number "68", did . . . what was the purpose of this?

Tr. 673–77. There followed several more questions to Charles Martz regarding the settlement agreement as part of the offer of proof, at the conclusion of which Fairfield's counsel stated, "I'm concluding my offer to prove." Tr. 681. At no time either prior or subsequent to the offer of proof did Fairfield actually move to admit the actual settlement agreement into evidence. Merely having it marked for purposes of allowing Charles Martz to refer to the document during the offer of proof did not constitute a motion to admit the exhibit. The offer of proof did not address the relevance of the settlement agreement itself, but rather the relevance of Charles Martz's testimony *about* the settlement agreement. The trial court could not have abused its discretion in failing to admit the settlement agreement when it was never asked to do so.

## II. "Alter Ego"

Fairfield contends that the trial court erred in concluding that Fairfield was the "alter ego" of Donald Martz, Virginia Martz, and Charles Martz and that the corporate veil should thus be pierced to hold them personally liable for Fairfield's actions.

### A. Standard of Review

Pursuant to Fairfield's request, the trial court entered findings of fact and conclusions of law. When a trial court enters special findings with its judgment pursuant to a Trial Rule 52 request, our standard of review is two-tiered. First, we consider whether the evidence supports the factual findings. Findings of fact will be set aside only if they are clearly erroneous; that is, if the record lacks any evidence or reasonable inferences from the evidence to support them. *Harco, Inc. of Indianapolis v. Plainfield Interstate Family Dining Associates*, 758 N.E.2d 931, 941 (Ind.Ct.App.2001). We neither reweigh the evidence nor assess the credibility of witnesses, but consider only the evidence most favorable to the judgment. *Id.* Second, we consider whether the findings support the judgment. *In re Estate of Penzenik v. Penz Products, Inc.*, 749 N.E.2d 61, 63 (Ind.Ct.App.2001). We will set aside a judgment only if it is clearly erroneous; that is, if it is unsupported by the findings of fact and conclusions thereon. *Fields v. Fields*, 749 N.E.2d 100, 108 (Ind. Ct.App.2001), *trans. denied.*

### B. Piercing the Corporate Veil

Fairfield contends that the trial court erred in concluding that Fairfield was the "alter ego" of Donald Martz, Virginia Martz, and Charles Martz because there was no finding, and no evidence to support such a finding, of fraud by the Martzes, and furthermore, the trial court's conclusion that the Martzes' used Fairfield to promote injustice is clearly erroneous.

#### 1. Requirements to Pierce the Corporate Veil

In general, the doctrine of "piercing the corporate veil" holds individuals liable for corporate actions based on the failure to observe corporate formalities. *Commissioner, Dept. of Environmental Mgmt. v. RLG, Inc.*, 755 N.E.2d 556, 563 (Ind.2001). The party seeking to pierce the corporate veil bears the burden of proving that the corporation is merely the instrumentality of another and that misuse of the corporate form constitutes a fraud or promotes injustice. *D.S.I. v. Natare Corp.*, 742 N.E.2d 15, 26–27 (Ind.Ct. App.2000), *trans. denied.* In exercising its equitable powers to pierce a corporate veil, the trial court engages in a highly fact-sensitive inquiry. *Winkler v. V.G. Reed*

*and Sons, Inc.,* 638 N.E.2d 1228, 1232 (Ind.1994). Therefore, we will give deference to the trial court's decision to pierce the corporate veil. *Smith v. McLeod Distrib., Inc.,* 744 N.E.2d 459, 462 (Ind.Ct. App.2000).

▮▮▮▮ "While no one talismanic fact will justify with impunity piercing the corporate veil, a careful review of the entire relationship between various corporate entities, their directors and officers may reveal that such an equitable action is warranted." *Stacey–Rand, Inc. v. J.J. Holman, Inc.,* 527 N.E.2d 726, 728 (Ind. Ct.App.1988). Our supreme court has held that in deciding whether the plaintiff has met the burden of piercing the corporate veil, the court may consider evidence of the following factors:

> (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form.

*Aronson v. Price,* 644 N.E.2d 864, 867 (Ind.1994). This list of factors is not necessarily exhaustive, and all factors need not be shown to support a decision to pierce the corporate veil. *See D.S.I.,* 742 N.E.2d at 27.

### 2. The Trial Court's Findings and Conclusions

The trial court made the following findings of fact and conclusions of law relevant to the issue of piercing the corporate veil:

#### *FINDINGS OF FACT*

\* \* \*

93. In response to Auburn's request for information on Fairfield's general background and qualifications, Fairfield provided Auburn with written materials . . . , which included:

- A Resume and Statement of Rental Housing Experience for Don and Virginia Martz;

- Representations that (a) Fairfield was formed on the "recommendation of the Martz Family's Estate Planning attorney," (b) Fairfield "includes the same basic personalities as Messer Development (MDC) and Martz Enterprises, Inc. (MEI)," and (c) Fairfield's officers, directors and shareholders are Martz family members.

\* \* \*

104. Don Martz completed ignored the corporate structure of Fairfield and controlled virtually every aspect of the business. . . .

105. Banks doing business with Fairfield believed that they were really dealing with Don Martz and the Martz family. . . .

\* \* \*

110. On May 13, 1992, on the personal stationery of Don and Virginia Martz, Don Martz requested interim financing of $750,000 for the Apartments from Farmers & Merchants State Bank ("Farmers & Merchants"). Significantly, in this letter, Don Martz attempted to convince Farmers & Merchants to approve the loan by stating:

> *Our family,* along with Auburn Development, is involved in building a 90 unit senior citizen Apartment project on the west side of Indianapolis (Georgetown Road).

\* \* \*

111. Eventually, Don Martz successfully obtained interim financing for the Apartments from Salin Bank. While the borrower was nominally Georgetown, it was clear that Salin Bank was ultimately looking to Don Martz and the Martz family for repayment. The commitment letter for the $750,000 loan was addressed to Don Martz, personally. The commitment required as collateral that Don and Virginia Martz give mortgages on two farms they owned, the personal guaranties of Don and Virginia Martz and their children, and the guaranties of three Martz related entities. . . .

\* \* \*

115. The Martzes freely commingled the assets of Fairfield with their personal assets and with the assets of other Martz entities.

\* \* \*

122. Fairfield's office—along with the offices of the other Martz entities— was located in a building owned by Virginia Martz. None of the entities using this space, including Fairfield, paid rent.

123. The office furniture, which had been purchased by one Martz entity, was shared by all of the Martz enterprises, including Fairfield, free of charge.

124. Fairfield's stationery was shared with two other Martz entities. . . .

125. When one Martz family entity needed money, the shortfall would simply be funded from another Martz entity.

126. . . . [T]wo other Martz family entities, would routinely put money into the Georgetown project and take it back when construction draws were made.

127. Don Martz used and/or referred to the Martz entities virtually interchangeably in his dealings with third parties relating to the Georgetown Woods project. . . .

128. Don Martz and the Martz family have manipulated Fairfield's corporate form in an attempt to make it judgment proof.

129. The Martz family used several entities to carry on its business. One purpose of these entities was to allow the family to phase out and stop using older companies and replace them with newly-formed ones. In this way, the Martz family manipulated which entity had assets at any given time. All new business was funneled to the new entities and old entities were allowed to die.

130. Fairfield ceased doing business in 1994, soon after the disputes with Georgetown arose.

131. Don Martz and the Martz family cut off all business to Fairfield at or about the time this lawsuit arose and funneled all new developments into other Martz family entities. Fairfield now has no ongoing projects and little or no cash flow. The present monetary value of Fairfield's accounts is no more than $4,500.

132. Fairfield failed to keep corporate records and to observe corporate formalities.

### CONCLUSIONS OF LAW

\* \* \*

31. The Fairfield corporate form was so ignored, controlled and manipulated by Don Martz and the Martz family it was merely an instrumentality of the Martz family and it would be unjust not to pierce the corporate veil.

32. In addition, the corporate veil of Fairfield should be pierced because Fairfield was undercapitalized, failed

to keep corporate records, commingled its assets with the Martz family and other Martz related entities, failed to observe corporate formalities, and used the corporate form to promote injustice by attempting to hide the Martz family assets.

Appellant's Appendix at 48–56, 62 (emphasis in original) (citations omitted).

### 3. "Alter Ego" Evidence

■ Fairfield addresses the trial court's findings and conclusions in the context of each of the *Aronson* factors for piercing the corporate veil; it argues conflicting evidence and absence of evidence on each of the factors. However, we do not need to address each factor individually because we hold that as a whole, the evidence supports the trial court's findings, and the findings support the judgment. The trial court, in its role as factfinder, is the appropriate entity to resolve any conflicts in the evidence. Moreover, the *Aronson* factors are just that: non-exhaustive factors that may be considered in determining whether to pierce the corporate veil. There does not necessarily need to be evidence of every *Aronson* factor in order to support piercing the corporate veil.

There was evidence before the trial court that the introductory materials provided by Fairfield to Auburn before Georgetown was formed represented that Donald was both president and a director of Fairfield. Fairfield's "resume," provided as part of the introductory materials, states that Fairfield "AKA Martz Enterprises, Inc. AKA Messer Development Corporation ... became involved in the construction and property development business in November of 1983." Ex. 56. However, Fairfield was not created until 1990. Tr. 458. The resume was actually a statement of the construction experience of other Martz family companies. Also included in the introductory materials was a statement of Donald and Virginia's business and construction background.

The letter from Auburn proposing the joint venture to construct Georgetown was addressed to Don. It stated, "We are proposing a joint venture between Martz and Auburn ... for the development, construction, and operation of Georgetown...." Ex. 16. The letter outlined the responsibilities of Auburn and "Martz." *Id.* Peter DeRose, Auburn's president, testified that the letter was addressed to Don Martz because "everyone believed Donald Martz to be the principal of Fairfield." Tr. 258. Auburn's representatives primarily dealt with Donald, and even when Charles was present, it was usually Donald who spoke on Fairfield's behalf. Peter DeRose also testified that "it was very clear that we were doing business with Don Martz, that was made abundantly clear [because] [w]e didn't deal with anybody else." Tr. 260. Michele Wessler, vice-president of Auburn, testified as follows:

> Q: When you ... dealt with Fairfield, what did you understand Don Martz' role to be in Fairfield Development?
>
> A: The chief, how's that? He was the chief. Every ... most all decisions went to Don ... everything was signed off by Don ... before anybody entered into any agreement or any scope of work was authorized.

Tr. 241. Even Don Martz himself testified that he never told Wessler that he was not an officer, director, or employee of Fairfield. Tr. 416.

Don Martz, together with Mike Kline, the "comptroller," acted on behalf of Fairfield to get financing for the project from First Federal Savings Bank. Don Martz did all of his banking there and had established a relationship with the bank in construction financing. The commitment let-

ter for the 2.4 million dollar construction loan from First Federal is addressed to Don Martz. Ex. 46. Don Martz and Virginia Martz personally signed the loan commitment as guarantors. *Id.* Don Martz testified that they were required to co-guarantee the construction loan because there was not enough financial stability in Fairfield for a loan of that magnitude. If they had not co-signed, the loan would not have been made. Later, when a bridge loan was required to continue the project, Don Martz wrote a letter to Farmers and Merchants State Bank on his and Virginia's personal stationery seeking the interim financing. The letter states that "[o]ur family, along with [Auburn] is involved in building a 90 unit ... project...." Ex. 50. As available collateral, the following are listed as willing co-signers: Brymar, Martz Enterprises, Inc., and Messer Development Corp., all Martz family companies, as well as Charles and Linda Martz, Mark and Donna Ferrebee, James and Michelle Phillips, and Ron and Lori Grate. The co-signers were required for the bridge loan because Fairfield did not have the capital to back up the loan.

As for the structure of Fairfield itself, Don Martz, Virginia Martz, and Mike Kline were signatories on Fairfield's business bank account. Ex. 40. The corporate resolution naming the three of them as signatories, signed by Lori Grate as secretary, lists Donald and Virginia as "Directors" of the corporation. With respect to the observation of corporate formalities, Charles Martz testified as follows:

Q: Are any of your personal funds comingled with those of Fairfield Development?

A: No.

Q: Does Fairfield Development pay any of your personal expenses using corporate funds?

A: No.

Q: Does Fairfield Development hold annual meetings?

A: Yes.

Q: Does Fairfield Development maintain a minute book?

A: Yes.

Q: Does Fairfield Development use written consent or hold special meetings before taking corporate action?

A: Yes.

* * *

Q: When you act on behalf of the corporation do you always endeavor to sign letters or agreements in the capacity as president of Fairfield Development?

A: Yes.

Q: Okay. Does Fairfield employ attorneys and accounts [sic] to advise it in the handling of its legal and financial matters?

A: Yes.

Tr. 525–27. At the time of trial, Fairfield did not own any real estate, did not own any apartment projects, was not constructing any developments, and was not earning any income from any business activity. The last construction project Fairfield was involved in was Georgetown. Mike Kline testified that Fairfield had two bank accounts at the time: a general operating account with a balance of approximately $3,000 to $3,500 and a payroll account with a balance fluctuating between $100 and $1,000. Fairfield's "offices" were in a building owned by Virginia which all Martz family businesses use for their office. Fairfield does not pay rent for its office space. Mike Kline also testified that it was a standard practice for other Martz family businesses to lend money to any of the other Martz family businesses when one had a shortfall.

Based upon the above-cited evidence, we are unable to say that the trial court's

finding that Fairfield was merely the "alter ego" of Don, Virginia, and Charles Martz was clearly erroneous. There is evidence in the record to support the trial court's findings of fact. Fairfield was formed as a new corporation for the specific purpose of entering into the joint venture with Auburn, but relied upon the experience, resources, and financial backing of the Martzes themselves and their bevy of companies to support the corporation. Fairfield has never been operated as an entity separate and apart from the Martzes themselves and the Martzes' other companies. Don Martz, allegedly not a director, officer, or shareholder of Fairfield, was nonetheless the principal figure in Fairfield's dealings with Auburn and was intimately involved in the Georgetown construction project. Charles Martz, the president of Fairfield by name, allowed Don Martz to control the corporation, and there was no evidence other than Charles' self-serving testimony that Fairfield ever observed the corporate formalities. Fairfield was started with and continues to operate with minimal financial resources. Fairfield was only able to engage in the Georgetown deal on the strength of Don and Virginia Martz's personal guarantees. When the Georgetown deal soured, Fairfield basically ceased doing business, and the Martzes funneled business to their other companies. Under these circumstances, the trial court was correct in concluding that if the corporate veil were not pierced, an injustice would result: Fairfield, never having been operated as an independent company, would not have the financial wherewithal to satisfy a judgment, and Georgetown believed throughout its associ-

ation with Fairfield that it was actually dealing with the Martz family itself. The trial court's judgment is not clearly erroneous: Fairfield was merely the instrumentality of the Martzes and were we to hold otherwise, we would be promoting an injustice.[1]

### III.  Breach of Contract

Fairfield also contends that the trial court erred in finding a breach of contract because Georgetown failed to prove an essential element of its claim: namely, damages.

### A.  Elements of Breach of Contract Claim

The essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages. *Rogier v. American Testing and Eng'g Corp.*, 734 N.E.2d 606, 614 (Ind.Ct.App.2000), *trans. denied.* Generally, the measure of damages for breach of contract is either such damages as may fairly and reasonably be considered as arising naturally from the breach itself, or as may be reasonably supposed to have been within the contemplation of the parties at the time they entered into the contract as a probable result of the breach. *Id.*

### B.  The Trial Court's Supplemental Order

Upon judgment in favor of Georgetown for Fairfield's breach of the Construction Contract, the trial court ordered a second phase of trial to determine the amount of damages attributable to the breach. Following that phase, the trial court entered supplemental findings of fact, conclusions

---

1.  The standard for piercing the corporate veil requires a showing that the misuse of the corporate form constitutes a fraud *or* promotes injustice. Fairfield has alleged that the trial court did not make any findings of fraud and that there is no evidence to support such

a finding. However, because the trial court did conclude that the Martzes' misuse of the corporate form promoted injustice, and because we hold that such a conclusion was supported by the evidence, there need be no additional finding of fraud.

of law, and judgment. In relevant part, the supplemental conclusions are as follows:

### SUPPLEMENTAL CONCLUSIONS OF LAW

\* \* \*

#### Damages for Construction Defects

34. The proper measure of damages for [Fairfield's] breach of the Construction Contract is the reasonable cost of curing the construction defects to make the Apartments conform to the contract....

35. [Fairfield] failed to meet their burden of proving that this is an "extreme case" in which a different measure of damages should be employed....

36. Georgetown met its burden of proof on damages by showing the cost of restoring the building to the condition promised by the contractor....

37. Georgetown's damages arising from defects in the construction of the Apartments are $345,700.00.

\* \* \*

#### Fairfield's Set–Off/Non–Payment Defenses

47. Res judicata prohibits both claims *and* defenses that are based on issues already the subject of a final judgment....

48. The doctrine of law of the case prevents this Court from reconsidering an issue in this case upon which the Indiana Appellate Court has ruled....

49. "A party cannot avail itself of the right to set-off unless it has a legally subsisting cause of action in its favor on which it could maintain an independent action." [Citations omitted.]

50. Res judicata bars Fairfield's defenses that (i) Fairfield is entitled to "setoffs" to Georgetown's claims against it, in the amount of sums Fairfield allegedly was not paid under the Construction Contract, and (ii) such alleged unpaid sums otherwise reduce or bar Georgetown's affirmative claims against it. Fairfield's allegations that it is owed money under the Construction Contract were already the subject of a final summary judgment entered against Fairfield.

51. Fairfield is not entitled to "setoffs" against Georgetown's claims for sums Fairfield alleges were not paid to it under the Construction Contract, and may not otherwise reduce or bar Georgetown's claims based on the alleged debt, because such defenses ask this Court to reconsider an issue upon which the Indiana Appellate Court has ruled in this case, specifically, whether Fairfield is owed any monies under the Construction Contract.

52. Fairfield cannot avail itself of a claimed right to such "setoffs" because it has no legally subsisting cause of action in its favor on which it could maintain an independent action against Georgetown.

53. In addition, Fairfield's contention that Georgetown is obtaining a windfall from Fairfield's breach of contract is unpersuasive and has no application here. Unlike in the ordinary construction damages dispute, Fairfield assigned its claims for payment under the Construction Contract and agreed to preserve the owner Georgetown's claim against it under the Construction Contract. Thus, by Fairfield's own agreement, Georgetown (i) does not owe Fairfield any more money under the Construction Contract and (ii) retained the right to sue Fairfield under the contract.

Appellant's Appendix at 74–75, 77–79 (emphasis in original) (citations omitted).

Fairfield claimed in the trial court, as it does on appeal, that the amounts remaining unpaid to Fairfield under the Construction Contract should be subtracted from Georgetown's damages.[2] Fairfield also contends that this court's decision in an earlier appeal between these parties is not res judicata.

This case has previously been before this court on a summary judgment ruling by the trial court. *Fairfield Dev., Inc. v. Georgetown Woods Senior Apartments Ltd. P'ship*, No. 49A04–9708–CV–361, 700 N.E.2d 1194 (Ind.Ct.App. Aug. 25, 1998). As noted in the *Facts and Procedural History* section, *supra*, when disputes arose over construction defects, Fairfield and Auburn entered into a settlement agreement which terminated the joint venture agreement. As part of the settlement agreement, Fairfield specifically assigned to Georgetown any claims it had with respect to the construction project. The assignment provision stated as follows:

*Assignment of Claims.* Upon withdrawal [of] Fairfield Development, Inc. ("Fairfield") from Georgetown Woods Senior Apartments Limited Partnership, Fairfield hereby assigns, transfers and conveys to Georgetown Woods Senior Apartments Limited Partnership any and all warranties, rights, causes of action o[r] claims that Fairfield may have with respect to the construction of Georgetown Woods Senior Apartments, including those that may accrue to Fairfield under the construction contracts dates July 29, 1992 and August 14, 1992,

between Georgetown Woods Senior Apartments Limited Partnership and Fairfield.

*Fairfield Dev., Inc.,* slip op. at 3–4. Fairfield subsequently filed a cause of action against Auburn and Georgetown alleging breach of contract, fraud, unjust enrichment, and intentional interference with a contractual relationship. Most relevant to the instant appeal, Fairfield alleged that Georgetown refused to make payments to it under the construction contract and that Georgetown was unjustly enriched by its failure to do so. Georgetown filed a motion for summary judgment claiming that the settlement agreement barred Fairfield from bringing its claims because it had assigned all of its rights for those causes of action to Georgetown. The trial court granted Georgetown's motion, and Fairfield appealed. We held that summary judgment was proper:

... [T]he settlement agreement read as a whole effected a separation between Fairfield and Auburn with respect to Fairfield's roles as general contractor and general partner of Georgetown. As a result, the claims that Fairfield seeks to assert against Georgetown in its third-party complaint were encompassed within the assignment clause of the settlement agreement and Fairfield is barred from pursuing such claims against Georgetown. Therefore, the trial court properly granted Georgetown's motion for summary judgment.

*Id.,* slip op. at 8.

▬▬▬ As the trial court noted in its supplemental order, the doctrines of res

---

**2.** Fairfield calculates the damages as follows: the trial court awarded $345,700.00 to Georgetown to repair defects in the Apartments, plus an additional $241,616.35 for payments due to subcontractors for a total damage award of $587,316.35. Appellant's Appendix at 63, 79. Under the Construction Contract, Georgetown agreed to pay Fairfield $3,122,000.00. Of that amount, Fairfield was

paid $2,411,686.00, leaving $710,314.00 of the contract price unpaid. Pursuant to Fairfield's assertion, the $710,314 not paid to Fairfield would be subtracted from the $587,316.35 damage award to Georgetown, and because this results in a negative number, Fairfield contends that Georgetown failed to prove any damages at all.

judicata and law of the case both operate to preclude litigation regarding matters which have already been litigated. *Mutchman v. Consolidation Coal Co.*, 666 N.E.2d 461, 464 (Ind.Ct.App.1996), *trans. denied.* Specifically, the doctrine of res judicata provides that a judgment on the merits is an absolute bar to a subsequent action between the same parties on the same claim. *Id.; see also Sullivan v. American Cas. Co.*, 605 N.E.2d 134, 137 (Ind.1992). "Under the law of the case doctrine, an appellate court's determination of a legal issue is binding in subsequent appeals given the same case and substantially the same facts." *City of New Haven v. Chemical Waste Mgmt. of Indiana, L.L.C.*, 701 N.E.2d 912, 919 (Ind.Ct.App.1998), *trans. denied* (citing *State v. Lewis*, 543 N.E.2d 1116, 1118 (Ind.1989)). All issues decided directly or implicitly in a prior appellate decision are binding in all subsequent portions of the same case. *Id.* However, unlike the rule of *res judicata*, the law of the case doctrine is a discretionary rule expressing the practice of the courts to refuse to reopen what has previously been decided. *Id.*

In the earlier appeal of this case, this court determined that Fairfield was not owed any monies under the Construction Contract. That was a final judgment as to those claims. By now asserting that sums not paid to it under the Construction Contract should be deducted from the damage award to Georgetown, Fairfield is basically seeking to be paid those sums, and res judicata precludes such a claim.

Nonetheless, Fairfield contends that the trial court's supplemental order demonstrates a "fundamental misunderstanding of Fairfield's argument...." Brief of Appellants at 20. "Fairfield did not, and is not, arguing that it should be entitled to affirmative relief under the Construction Contract or that it is owed monies giving rise to an affirmative defense.... Instead, Fairfield asks that the lawful measure of damages be applied to Georgetown's claim." *Id.* In this regard, we acknowledge that Fairfield is not seeking to be paid any monies. According to Fairfield's argument, the trial court's damage award of $587,316.35 must be offset against $710,314.00, the difference between the Construction Contract amount and the amount Fairfield was actually paid. However, Fairfield does not seek to be paid the $122,997.65 difference between the damage award and the contract shortfall. But whether Fairfield seeks affirmatively to be paid or seeks to be paid in the form of not having to pay a damage award, the result is the same: Fairfield is asserting an entitlement to monies to which this court has already determined it is not entitled.

We also agree with Fairfield that the settlement agreement did not change the proper method of calculating damages. Nonetheless, by entering into the settlement agreement with Georgetown, Fairfield basically agreed to alter the contract amount from the original contract price to the amount paid to date. Fairfield agreed to forego further payment from Georgetown in return for the opportunity to share in future partnership proceeds with Auburn, reducing the unpaid amount of the contract to zero. Georgetown did not, therefore, actually avoid any costs. The trial court did not err in its damage calculation.

*Conclusion*

The trial court did not abuse its discretion in failing to admit Fairfield's Exhibit 68 because it was never asked to admit said exhibit for trial purposes. The trial court's judgment that Fairfield's corporate veil should be pierced to hold Donald Martz, Virginia Martz, and Charles Martz personally liable for Fairfield's obligations is supported by the evidence and is not,

therefore, clearly erroneous. Finally, the trial court applied a proper method of determining damages. The judgment of the trial court is affirmed.

Affirmed.

KIRSCH and SULLIVAN, JJ., concur.