**Thomas LONGHI, Appellant–
Defendant,**

v.

**Louis MAZZONI & Lorraine Mazzoni,
Appellees–Plaintiffs.**

No. 45A03–0812–CV–609.

Court of Appeals of Indiana.

Oct. 8, 2009.

Rehearing Denied Dec. 1, 2009.

Mark Van Der Molen, Merrillville, IN, Attorney for Appellant.

Beth L. Brown, Kelly Law Offices, Crown Point, IN, Attorney for Appellees.

## OPINION

BROWN, Judge.

Thomas Longhi appeals the trial court's judgment in favor of Louis and Lorraine Mazzoni. Longhi raises several issues, which we revise and restate as:

I. Whether the trial court erred in piercing the corporate veil of Schema Development Company, LLC ("Schema LLC"); and

II. Whether the trial court erred when it awarded the Mazzonis treble damages.

We affirm.

The facts most favorable to the Mazzonis follow. Schema Development Company Inc. ("Schema Inc.") and Deep River Pointe Development Corporation ("DRPDC") were formed to purchase, finance, and develop a residential real estate subdivision (the "Project") known as Deep River Development in Hobart, Indiana.

Longhi was a shareholder in Schema Inc. and an officer of both Schema Inc. and DRPDC.

Longhi was an architect whose role in the Project was to be the representative on-site, assist with sales, meet with customers and help them with the selection process of their finishes, and serve as a liaison between customers and the construction superintendent for the Project.

Longhi was a "family friend" of the Mazzonis. Transcript at 88. Louis knew Longhi's parents for "50, 60 years" and knew Longhi "since he was born." *Id.* Longhi contacted Louis Mazzoni by telephone regarding an offer to build a house for them in the residential subdivision Project. Louis told Longhi that he could not "afford [Longhi's] new homes." *Id.* at 89. Longhi offered to build a house for the Mazzonis "at 50 percent off the price." *Id.*

After receiving Longhi's phone call, Louis discussed Longhi's offer with his wife Lorraine and his four adult children. The Mazzonis believed they could sell the house in which they were living and come up with a down payment enabling them to afford the new house. Louis called Longhi and told him of their interest in purchasing a house. Louis expected Longhi to explain that a down payment of about ten or twenty percent of the purchase price would be required, but instead Longhi explained that in order for the Mazzonis to receive the offered fifty-percent discount the Mazzonis "would have to give [Longhi] $50,000 as a down payment." *Id.* at 92. Louis had to think over the offer and how he was going to "come up with [$]50,000." *Id.*

Longhi met with the Mazzonis at the Project's field office, and Longhi presented the Mazzonis with two documents to sign: a Purchase Agreement and a Promissory Note. The Mazzonis and DRPDC executed the Purchase Agreement dated January

13, 1996, for the purchase of a lot and the construction of a house. The Purchase Agreement provided that the Mazzonis would purchase "Lot # 57 or 62 Type of Residence" and that the purchase price would be "50% of Price Sheet." Appellee's Appendix at 54; Plaintiffs' Exhibit 1. At some point after the execution of the Purchase Agreement, the Mazzonis selected Lot 57.

The Purchase Agreement also provided that the "[c]losing date shall be ... on or before to be determined by Purchaser," and that DRPDC would "surrender possession of the premises on or before to be determined by Purchaser." *Id.* Paragraph R of the Purchase Agreement provided in part: "Purchaser submits herewith $50,000 in form of ... other: Promissory Note as earnest money which shall be applied to the purchase price." Appellee's Appendix at 55; Plaintiffs' Exhibit 1. Paragraph R also provided that "the Seller shall ... deposit all cash and/or checks received into Broker's trust account...." *Id.* The Mazzonis also signed the Promissory Note dated January 13, 1996, in favor of Schema Inc. in the amount of $50,000 to serve as the earnest money deposit under the Purchase Agreement.[1]

The Mazzonis delivered two cashier's checks, each dated February 6, 1996, to Longhi to fulfill their obligations under the Promissory Note. The cashier's checks were endorsed by Louis to the order of Schema Inc. Longhi did not deposit the Mazzonis' earnest money deposit into a broker's trust account. The $50,000 earnest money was deposited into the bank account for Schema Inc. Schema Inc.'s account was used to finance the development of the Project.

In the early fall of 1996, Schema LLC was formed "to take over and complete the project" to develop the residential subdivision. Transcript at 13. After Schema LLC was formed, bank accounts in the name of Schema Inc. were transferred to Schema LLC. The same individuals who had been the principals of Schema Inc. were the principals of Schema LLC. Longhi had the same percentage interest in Schema LLC as he had in Schema Inc.[2] Longhi was a member and a manager of Schema LLC.

The Mazzonis worked with Schema Design Group, Ltd. ("Schema Design"). The Mazzonis made changes to the design of the house as set forth on plans developed by Schema Design.

At some point, the Mazzonis became concerned because the construction of their house had not started. Louis asked Longhi why construction had not yet commenced, and Longhi told him that "X number of homes [needed to be] sold before [DRPDC] start[ed] cutting holes and building the homes." *Id.* at 107. In approximately April and June of 1998, the Mazaonis requested that Longhi return their $50,000 earnest money deposit. On one occasion, the Mazzonis visited the Project job site and spoke with Longhi. Longhi told the Mazzonis that "there are new investor[s]" and that "he will see what he can do to get [the Mazzonis'] money back...." *Id.*

Louis sent several faxes to DRPDC with some changes to the plans for the house to be constructed, but did not receive any

---

1. The Purchase Agreement and the Promissory Note were the only two written agreements between the Mazzonis, Schema Inc., and DRPDC in connection with the Mazzonis' purchase and construction of a house.

2. Longhi testified that his share interest in Schema Inc. and his membership interest in Schema LLC was "[a] little over one percent." Transcript at 44.

response from Longhi or anyone in connection with the Project. Louis also left phone messages and sent correspondence to Longhi by facsimile and registered mail, but he "was having problems getting in touch with him." *Id.* at 99. Louis inquired about the progress and voiced concerns about the lack of progress, but he did not receive any response. The Mazzonis would "try to make phone calls and leave messages and there was just no progress." *Id.* at 112. The Mazzonis visited the Project site "[f]our or five times at least" and "[t]here was no one there.... The sales office was closed. There was no activity." *Id.* at 138.

The Mazzonis never received a refund of their $50,000 earnest money deposit and did not receive a deed to a lot developed as part of the Project. In 1998, Longhi was asked to leave Schema LLC and the Project. The Mazzonis did not learn that Longhi was no longer with Schema LLC. In mid- to late–1998, after the Mazzonis "felt like [they] were getting ignored and weren't getting anywhere," they decided to contact an attorney to assist them in recovering their earnest money deposit. *Id.* at 112.

In July of 1999, the Mazzonis filed a complaint against Schema LLC alleging breach of contract and fraudulent misrepresentation. In August of 1999, Schema filed its answer denying the Mazzonis substantive allegations. In March of 2001, the Mazzonis filed an amendment to its complaint alleging that Longhi was personally liable for the receipt, escrow, and disposition of the Mazzonis' deposit funds. In July of 2003, Longhi filed an answer denying the Mazzonis' substantive allegations. In June and September of 2003, Longhi sent letters to the Mazzonis requesting the Mazzonis contact an attorney who helped

other investors settle their claims for discounted homes at the Project site. A bench trial was held on February 20, 2008. On October 14, 2008, the trial court entered an order finding Longhi personally liable for the return of the Mazzonis' down-payment under the doctrine of piercing the corporate veil and under the theory of quantum meruit, and awarding the Mazzonis treble damages in the total amount of $150,000 and attorney fees. November of 2008, Longhi filed a motion to correct errors, which the trial court denied.

## I.

The first issue is whether the trial court erred in piercing the corporate veil of Schema LLC. The trial court entered findings of fact and conclusions of law. When a trial court enters findings with its judgment, our standard of review is two-tiered. First, we consider whether the evidence supports the factual findings. *Fairfield Dev., Inc. v. Georgetown Woods Sr. Apartments Ltd. P'ship,* 768 N.E.2d 463, 468 (Ind.Ct.App.2002), *trans. denied.* Findings of fact will be set aside only if they are clearly erroneous; that is, if the record lacks any evidence or reasonable inferences from the evidence to support them. *Id.* We neither reweigh the evidence nor assess the credibility of witnesses, but consider only the evidence most favorable to the judgment. *Id.* Second, we consider whether the findings support the judgment. *Id.* We will set aside a judgment only if it is clearly erroneous; that is, if it is unsupported by the findings of fact and conclusions thereon. *Id.*

As a general rule, Indiana courts are reluctant to disregard corporate identity and do so only to protect third parties from fraud or injustice when transacting

business with a corporate entity.[3] *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC,* 870 N.E.2d 494, 504 (Ind.Ct.App.2007); *Oliver v. Pinnacle Homes, Inc.,* 769 N.E.2d 1188, 1191 (Ind.Ct.App.2002), *trans. denied; Stacey–Rand, Inc. v. J.J. Holman, Inc.,* 527 N.E.2d 726, 728 (Ind.Ct.App. 1988) ("[T]here are cases where, to prevent fraud or injustice, it is necessary to disregard the fiction of distinct corporate existence, and to hold as a *matter of equity* that such separate legal entity does not exist."), *reh'g denied.* The party seeking to pierce the corporate veil bears the burden of proving that the corporation is merely the instrumentality of another and that misuse of the corporate form constitutes a fraud or promotes injustice. *Escobedo v. BHM Health Associates, Inc.,* 818 N.E.2d 930, 935 (Ind.2004); *Fairfield Dev., Inc.,* 768 N.E.2d at 468 (citing *D.S.I, v. Natare Corp.,* 742 N.E.2d 15, 26–27 (Ind. Ct.App.2000), *reh'g denied, trans. denied* ). In exercising its equitable powers to pierce a corporate veil, the trial court engages in a highly fact-sensitive inquiry. *Fairfield Dev., Inc.,* 768 N.E.2d at 468–469 (citing *Winkler v. V.G. Reed and Sons, Inc.,* 638 N.E.2d 1228, 1232 (Ind.1994)). Therefore, we will give deference to the trial court's decision to pierce the corporate veil. *Id.* at 469 (citing *Smith v. McLeod Distrib., Inc.,* 744 N.E.2d 459, 462 (Ind.Ct.App. 2000)); *Four Seasons Mfg., Inc.,* 870 N.E.2d at 504.

To decide whether the plaintiff has met its burden, we consider whether the plaintiff has presented evidence showing:

(1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form.

*Aronson v. Price,* 644 N.E.2d 864, 867 (Ind.1994). This list of factors is not necessarily exhaustive, and all factors need not be shown to support a decision to pierce the corporate veil. *See D.S.I.,* 742 N.E.2d at 27.

Longhi argues that the trial court erred in piercing Schema LLC's corporate veil and holding him individually liable to the Mazzonis for the return of the Mazzonis' $50,000 earnest money deposit. Longhi argues that the evidence does not support the trial court's findings and conclusions. Specifically, Longhi appears to argue that the evidence does not support the trial court's findings that: (A) Schema Inc. was undercapitalized; or (B) Longhi used Schema Inc. and Schema LLC to promote fraud. We address these arguments separately.

---

**3.** Courts have pierced the corporate veil of limited liability companies. *See Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC,* 870 N.E.2d 494, 504–506 (Ind.Ct.App.2007) (piercing corporate veil of limited liability company). Also, courts have pierced a corporate veil to find an individual liable even where the individual was not a shareholder/member of a corporation/company. *See Fairfield Dev., Inc.,* 768 N.E.2d at 473 (imposing liability on an individual who was not a shareholder of a corporation on the basis that the individual's

personal conduct promoted injustice where the individual was the principal figure in the corporation's dealings with the appellee party and was intimately involved in the corporation's construction project); *Hart v. Steel Products, Inc.,* 666 N.E.2d 1270, 1276–1277 (Ind.Ct.App.1996) (imposing liability on the agent of a corporation on the basis that the agent committed fraud and the agent's conduct would result in manifest injustice), *reh'g denied, trans. denied.*

## A. Undercapitalization of Schema

■ Longhi argues that the evidence does not support the trial court's finding that Schema Inc. was undercapitalized for purposes of the trial court's decision to pierce the corporate veil. Specifically, Longhi argues that the evidence does not support Paragraphs 18 and 20 of the findings of fact and that the findings do not support the trial court's conclusion that Schema Inc. was undercapitalized.

Paragraph 18 of the trial court's order states: "From the start, the project was undercapitalized. Longhi testified that approximately $250,000 to $300,000 capital was initially raised. He further testified that based on bank requirements and financial projections the developers needed $400,000." Appellant's Appendix at 14. Paragraph 20 of the trial court's order states: "Longhi and his partners hoped that if sufficient capital could be raised from large down-payments, the bank would disburse the construction funds to Schema." *Id.*

Longhi concedes that the "finding correctly found that initial capital of $250,000 to $300,000 was raised by the shareholders." Appellant's Brief at 19. However, Longhi argues that the trial court erred in finding that "based on bank requirements and financial projections that the developers needed $400,000." *Id.* Longhi appears to argue that Schema was not undercapitalized because the evidence showed that

Schema's capital account had reached $400,000 at the time the Mazzonis entered into the Purchase Agreement and because "the amount of Schema's capitalization was deemed large enough to be satisfactory to the bank." *Id.* at 20. The Mazzonis argue that Schema was "grossly underfunded" at the time the company was formed and that the company's plan "to raise additional capital by offering 'discount homes' in exchange for substantial down payments" evidences that the Project was undercapitalized. Appellee's Brief at 10.

■ "Inadequate capitalization" means capitalization very small in relation to the nature of the business of the corporation and the risks attendant to such businesses. *Cmty. Care Centers, Inc. v. Hamilton*, 774 N.E.2d 559, 565 (Ind.Ct.App. 2002) (quoting 1 WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 41.33 at 652 (perm. ed.1999)), *trans. denied.* The adequacy of capital is measured by evaluating the amount of capital the company had at the time of its formation, unless the company at some point substantially expands the size or nature of its business with an attendant increase in business hazards. *Id.*

Here, the parties do not direct us to any evidence in the record regarding the amount of paid-in capital to Schema Inc. at its inception.[4] However, the record reveals that Schema Inc. had raised "some-

**4.** We treat Schema Inc. and Schema LLC as the same entity (together referred to hereinafter as "Schema") for purposes of our analysis because Schema LLC was formed "to take over and complete the project" initially undertaken by Schema Inc., the bank accounts in the name of Schema Inc. were transferred to Schema LLC, the same individuals who had been the principals of Schema Inc. were the principals of Schema LLC, and Longhi had the same percentage interest in Schema LLC as he had in Schema Inc. *See Oliver*, 769 N.E.2d at 1192 (observing that the separate-

ness of affiliated companies may be disregarded where the companies are controlled as one enterprise to cause fraud or injustice and noting that factors to consider to determine whether to disregard the separateness of the companies include whether similar corporate names were used, whether the corporations shared common principal corporate officers, directors, and employees, whether the business purposes of the corporations were similar, and whether the corporations were located in the same offices).

where in the range of $150,000 to $300,000" in initial capital for the Project. Transcript at 9. According to Longhi, Schema needed to raise "around [$]400,000" in capital in order to finance a real estate development project the size of the Project. *Id.* at 10. Schema's determination of how much capital it needed "was based on the bank requirements and the financial projections." *Id.* at 9. The record also reveals that Schema had a market analysis company for residential development perform "an in depth market analysis" which was "used to develop the program for the housing" for the Project, including the sizes and prices of the houses to be constructed. *Id.* at 41–42.

In addition, the record reveals that Longhi testified: "I believed we had [$250,000] to [$]300,000. We thought we needed about [$]400,000. So what I presented to the Mazzonis was that for an investment in the project of $50,000, we would offer them a half-price house." *Id.* at 10. Longhi testified later that the Mazzonis "were offered a discounted house in exchange for investment in the project." *Id.* at 24. When questioned about where the Mazzonis' $50,000 earnest money deposit funds were deposited, Longhi testified that the funds were turned over to a partner of his whose "responsibility was sales marketing and the financial aspects of the development." *Id.* at 30. Longhi reiterated: "And the main point was that this was an investment in the project." *Id.* Longhi also testified that Schema needed to "hit a certain volume of sales" in order to be able to construct a house for the Mazzonis for half-price, and that the "proceeds from the profits of the project would pay for the ... construction of their house." *Id.* at 31. Longhi testified that "three or four" others agreed to invest in the Project for a discounted house. *Id.* at 36.

Based upon the evidence above, we cannot say that the trial court clearly erred when it found that "based on bank requirements and financial projections the developers needed $400,000" or that "Longhi and his partners hoped that if sufficient capital could be raised from large down-payments, the bank would disburse the construction funds to Schema." *See* Appellant's Appendix at 14. In addition, based upon the fact that Schema did not have the amount of capital needed to finance the Project based upon its lender's capital requirements and the in-depth market analysis that it had performed at the time of Schema Inc.'s formation or the Project's initiation, and the fact that Longhi repeatedly testified that the Mazzonis' $50,000 payment to Schema Inc. constituted an investment in the Project, we cannot say that the trial court's conclusion that the evidence showed that Schema and the Project were undercapitalized at the time Schema Inc. was formed was clearly erroneous. *See Fairfield Dev., Inc.,* 768 N.E.2d at 473 (piercing the corporate veil and observing that corporation was started with and continued to operate with minimal financial resources); *Hart v. Steel Products, Inc.,* 666 N.E.2d 1270, 1277 (Ind. Ct.App.1996) (holding that evidence supported a finding that a corporation was significantly and continuously undercapitalized as a basis for piercing the corporate veil), *reh'g denied, trans. denied; Stacey-Rand, Inc.,* 527 N.E.2d at 729 (indicating that evidence existed which tended to show that the company was substantially undercapitalized).

### B. *Fraud*

■ Longhi argues that the evidence does not support the trial court's determination that he used Schema to promote fraud. The trial court's order included the following findings of fact:

83. The Mazzonis relied on Longhi's representations and assurances that they were going to receive a home in [the Project].

84. Longhi failed to tell the Mazzonis he was using them to raise capital for the project.

85. Longhi's representations and assurances to the Mazzonis were false and misleading.

86. The price Longhi offered to build the house at was a fraudulent attempt to induce the Mazzonis into giving him and his company money.

Appellant's Appendix at 19–20.

Longhi argues that "[n]o testimony was presented that Longhi never intended to fulfill the agreement and had only planned to secure $50,000 from the Mazzonis for 'raising capital.'" Appellant's Brief at 21–22. However, the record reveals that Longhi testified that he was indeed raising investment capital from the Mazzonis. Specifically, Longhi testified that what he "presented to the Mazzonis was ... for an investment in the project of $50,000," that he "offered a discounted house in exchange for investment in the project," and that "the main point was that [the Mazzonis' $50,000 deposit] was an investment in the project." Id. at 10, 24, 30. Longhi also testified that the Mazzonis' $50,000 payment was an investment in the Project, and "that the proceeds from the profits of the project would pay for the development of their house...." Id. at 31. Indeed, the evidence reveals that the Mazzonis' earnest money payment was deposited into Schema Inc.'s account and used to finance development of the Project.

The record also reveals that the Mazzonis did not believe they were investing in Schema or the Project, but believed they were making an earnest money deposit on a house. Specifically, the Purchase Agreement provided that the Mazzonis' $50,000 payment to Schema Inc. constituted an earnest money deposit which would be applied to the purchase price of the house, and did not characterize the payment as an investment.[5] Moreover, the record reveals that Louis testified that he and Longhi never discussed investing in the Project or investing in Schema Inc., DRPDC, or Schema LLC. Louis testified he "was not an investor," that he was "buying a home," and that the $50,000 payment "was a down payment, not an investment." Id. at 105, 126. Louis testified that had he been told that his house would not be constructed unless there were additional investors, that he and his wife "would not have signed anything." Id. at 105.[6]

---

**5.** To the extent that Longhi testified that "[i]t was [his] understanding [the Promissory Note] was an agreement on [the Mazzonis] part that they would invest the $50,000" in part because the Promissory Note constituted a business loan, we note that the trial court found that "[t]he Agreement between the Mazzonis, Longhi, and Longhi's companies was for the purchase and construction of a lot and home, as specifically stated in the Purchase and Sale Agreement" and that the "Agreement between the parties was not an investment in [the Project] but was for the purchase of real estate." Appellant's Appendix at 16, 19, 20. There was evidence to support the trial court's determination and we cannot say that the trial court's determination was clearly erroneous.

**6.** Longhi also argues that the trial court's findings are not "supported by evidence in the record as to any past or existing fact at the time the Mazzonis entered into the contract." Appellant's Brief at 21. However, we observe that the record shows that Longhi failed to inform the Mazzonis that he was using them to raise capital for the Project and that Longhi offered the Mazzonis a discounted house in order to raise a $50,000 capital investment for the Project before the Mazzonis entered into the Purchase Agreement or delivered their $50,000 payment to Longhi.

Longhi also appears to argue that the evidence does not support the "trial court's conclusion that the deposit needed to be placed in a broker's trust account." Appellant's Brief at 22. Based upon the facts that the Promissory Note indicated that the $50,000 payment was to be made to Schema, Inc. and that the Mazzonis made the payment to Schema, Inc., Longhi argues that "the parties by their understanding reflected in writing and by their subsequent conduct undoubtedly showed that the down payment was not to be deposited into a brokers trust account, but was to be paid directly to the corporation." *Id.* at 23.

We note that while Longhi is correct that the Promissory Note provided that the Mazzonis were to make their $50,000 payment directly to Schema, Inc., Paragraph R of the Purchase Agreement provided that Schema Inc., as Seller, "shall ... deposit all cash and/or checks received into Broker's trust account." Appellee's Appendix at 55. In addition, even if Schema Inc. was not required to deposit the Mazzonis' two cashier's checks comprising the $50,000 payment into a broker's trust account or into an escrow account, we note that the Purchase Agreement did not provide that Schema Inc. was entitled to retain the $50,000 payment. Paragraph R characterized the $50,000 as earnest money which would be applied to the purchase price. Further, Paragraph S provided that if either party failed to close the purchase and sale transaction, then the other party would pay the non-defaulting party an amount of fifteen percent of the purchase price as damages; Paragraph S did not provide that Schema Inc. would have been entitled to retain the $50,000 earnest money payment as liquidated damages in the event that the transaction failed to close. The record reveals that the Mazzonis' $50,000 earnest money payment was not deposited into a broker's

trust account or otherwise held by Schema Inc. as an earnest money deposit. Instead, the evidence shows that the Mazzonis' earnest money was deposited into Schema Inc.'s account and used to finance development of the Project.

We also note that the trial court made other findings of fact which support its conclusion that Longhi used Schema to promote fraud. For instance, the trial court found that "[a]t no point during the design process were the Mazzonis told the home would not be built unless the DRPDC was successful." Appellant's Appendix at 18. The trial court also found that "[Louis] repeatedly asked Longhi when construction was going to begin on the home" and that "[n]ot until that time did Longhi inform the Mazzonis that their home could not be started until the project had [additional] purchasers because the bank would not disburse money for construction...." *Id.* The court also found that "Longhi had a duty to be honest and truthful in his dealings with the Mazzonis given the fact that he was a long time family friend, that he was acting as a business agent, that he was selling a parcel of property, and that he knew the Mazzonis trusted him." *Id.* Longhi does not appear to argue that the evidence does not support these findings; however, our review of the record reveals that evidence exists in the record to support the trial court's findings.

The evidence found in the record supports the trial court's findings that the Mazzonis "relied on Longhi's representations and assurances," that Longhi "failed to tell the Mazzonis he was using them to raise capital for the project," that "Longhi's representations and assurances to the Mazzonis were false and misleading," and that the "price Longhi offered to build the house at was a fraudulent attempt to induce the Mazzonis into giving him and his

company money." *See* Appellant's Appendix at 19–20. Based upon the evidence above, we cannot say that the trial court's findings or conclusion regarding Longhi's use of Schema to promote fraud were clearly erroneous. *See Hart,* 666 N.E.2d at 1277 (holding that evidence supported the trial court's finding that an individual, as an agent of a corporation, committed fraud by misrepresenting the company's financial position as a basis for piercing the corporate veil of the corporation); *Four Seasons Mfg., Inc.,* 870 N.E.2d at 504 (affirming the trial court's determination that fraud was committed in the transfer of assets as a basis for piercing the corporate veil of the company).

Based upon our review of the evidence and in light of our standard to give deference to the trial court's decision to pierce the corporate veil, we cannot say that the trial court's decision to pierce the corporate veil of Schema LLC and hold Longhi liable was clearly erroneous.[7]

## II.

■ The next issue is whether the trial court erred when it awarded treble damages to the Mazzonis. Longhi argues that the trial court erred in awarding treble damages to the Mazzonis under Ind.Code § 34–24–3–1. We will reverse the trial court's award of treble damages under Ind.Code § 34–24–3–1 only if the trial court's judgment is clearly erroneous. *See Whitaker v. Brunner,* 814 N.E.2d 288, 297 (Ind.Ct.App.2004), *trans. denied.* A judgment is clearly erroneous in this context

when a review of the record leaves us with a firm conviction that a mistake has been made. *See id.*

Ind.Code § 34–24–3–1 provides:

"If a person suffers a pecuniary loss as a result of a violation of IC 35–43, IC 35–42–3–3, IC 35–42–3–4, or IC 35–45–9, the person may bring a civil action against the person who caused the loss for the following:

(1) An amount not to exceed three (3) times the actual damages of the person suffering the loss. . . ."

The relevant statute referenced in Ind.Code § 34–24–3–1 is Ind.Code § 35–43–5–3(a), which provides as follows:

A person who:

\*    \*    \*    \*    \*    \*

(2) knowingly or intentionally makes a false or misleading written statement with intent to obtain property; [or]

(3) misapplies entrusted property, property of a governmental entity, or property of a credit institution in a manner that the person knows involves substantial risk of loss or detriment to either the owner of the property or to a person for whose benefit the property was entrusted;

\*    \*    \*    \*    \*    \*

commits deception, a Class A misdemeanor.

Longhi also raises the issue of whether the trial court erred in determining that Longhi was liable under the theory of quantum meruit. We need not address this issue because we affirm the trial court's decision to impose liability on Longhi upon other grounds.

---

**7.** Because we conclude that the trial court did not err in finding that Longhi used Schema to promote fraud, we need not address Longhi's argument that the trial court erred in finding that he failed to properly document the Mazzonis' earnest money deposit in company records. We note that "all factors need not be shown to support a decision to pierce the corporate veil." *See D.S.I.,* 742 N.E.2d at 27.

■ In order to recover treble damages under Ind.Code § 34–24–3–1, it is not necessary that there have been a conviction for one of the crimes stated in Ind. Code § 35–43 regarding offenses against property. *See Breining v. Harkness,* 872 N.E.2d 155, 159 (Ind.Ct.App.2007), *reh'g denied, trans. denied.* Rather, commission of a crime must be shown by a preponderance of the evidence. *Id.*

Here, the trial court made the following findings of fact:

43. Pursuant to the terms and conditions of the [Purchase Agreement] and [Promissory Note], the Mazzonis tendered $50,000 in the form of two cashier's checks....

\* \* \* \* \* \*

45. Longhi went to [Louis's] work and collected the checks from [Louis].

\* \* \* \* \* \*

47. Paragraph R of the Purchase Agreement specifically required Longhi and Schema to deposit, within 2 banking days after the acceptance of the Purchase Agreement, all checks into a broker's trust account.

48. Paragraph R [of the Purchase Agreement] required all earnest money be returned if the transaction did not close.

\* \* \* \* \* \*

50. The checks were eventually deposited in Schema's general account ..., not broker's trust account, and the funds were commingled with the company's other assets.

\* \* \* \* \* \*

77. The Mazzonis' $50,000 down-payment was never returned to them,

78. The Mazzonis' $50,000 down-payment was used by Schema LLC ... to pay their creditors and debts.

Appellant's Appendix at 16–17, 19.

We first observe that the record reveals that Longhi presented the Mazzonis with a Purchase Agreement which provided that the Mazzonis' $50,000 payment constituted earnest money and that "all cash and/or checks received [would be deposited] into Broker's trust account." Appellee's Appendix at 55. The Purchase Agreement provided that the Mazzonis' earnest money would be applied to the purchase price. The Purchase Agreement also provided that a party that failed to close the transaction would pay the other party an amount of fifteen percent of the purchase price, and the Purchase Agreement did not provide that the seller would be entitled to retain the $50,000 it held as earnest money.

Nevertheless, the Mazzonis' $50,000 payment was not deposited into a broker's trust account or otherwise held by Schema as earnest money as required by the Purchase Agreement. Instead, the evidence shows that the Mazzonis' payment was deposited into Schema Inc.'s account and used to finance development of the Project. Indeed, the record reveals that Longhi testified that the Mazzonis' $50,000 payment constituted an investment in the Project and that the proceeds from the profits of the Project would pay for the construction of the Mazzonis' house. We further observe that, even if Longhi did not misapply the Mazzonis' $50,000 payment by failing to deposit the payment in a broker's trust account, we cannot say that the $50,000 payment was not misapplied when it was deposited into Schema's account and used to fund development of the Project instead of retained as an earnest money deposit as required by the Pur-

chase Agreement. The record also reveals that the Mazzonis did not receive a refund of their $50,000 earnest money payment and did not receive a deed to a lot or a house as set forth in the Purchase Agreement.

In addition, even though Longhi testified that he was raising investment capital from the Mazzonis, and in fact the Mazzonis' earnest money payment was deposited into Schema's account and used to finance development of the Project, Longhi nevertheless presented the Mazzonis with a written Purchase Agreement which expressly stated that the Mazzonis' $50,000 payment constituted "earnest money." *See* Transcript at 30; Appellee's Appendix at 55.

Given the evidence and findings above, we conclude that there was sufficient evidence to support the trial court's conclusion that Longhi either "knowingly or intentionally ma[de] a false or misleading written statement" to obtain the Mazzonis' $50,000 payment under subsection (2) of Ind.Code § 35–43–5–3(a) or "misapplie[d] entrusted property" in a manner that he knew "involve[d] substantial risk of loss" under subsection (3) of Ind.Code § 35–43–5–3(a). Therefore the trial court's judgment awarding the Mazzonis treble damages under Ind.Code § 34–24–3–1 was not clearly erroneous. *See Heartland Resources, Inc. v. Bedel,* 903 N.E.2d 1004, 1008 (Ind.Ct.App.2009) (holding that the trial court did not err when it awarded treble damages under Ind.Code § 34–24–3–1); *Harlan Bakeries, Inc. v. Muncy,* 835 N.E.2d 1018, 1037 (Ind.Ct.App.2005) (concluding that the trial court's award of treble damages under Ind.Code § 34–24–3–1 was appropriate); *Whitaker,* 814 N.E.2d at 298 (holding that the trial court's award of treble damages was not clearly erroneous); *Johnson v. Naugle,* 557 N.E.2d 1339, 1348 (Ind.Ct.App.1990) (holding that the evi-

dence was sufficient to support the award of treble damages).

For the foregoing reasons, we affirm the decision of the trial court to pierce the corporate veil of Schema LLC to hold Longhi liable and award the Mazzonis treble damages.

Affirmed.

MAY, J., and CRONE, J., concur.